THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD ROSE, Defendant-Appellant.

First District (1st Division)    No. 77-1550

Opinion filed August 6, 1979.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Gerald E. Nora, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Richard Rose, was charged by information with armed robbery, robbery, unlawful restraint, aggravated kidnapping and rape. A jury found him not guilty of armed robbery, but guilty of robbery, unlawful restraint, aggravated kidnapping and rape. The trial court merged the unlawful restraint and aggravated kidnapping convictions into the rape conviction. Defendant received consecutive sentences of 10 to 30 years for rape, and 3 to 10 years for robbery. Defendant appeals.

The complainant testified that at 8 p.m. on January 10, 1976, she was waiting by herself for a bus on the northeast corner of 119th Street and Michigan Avenue, when a man approached her, placed a gun against her stomach and said, "Come, go with me, motherfucker, come, go with me." This man then grabbed her arm and motioned for her to go with him. They began walking north on the east side of Michigan Avenue, but soon crossed to the west side and continued north until they reached 118th Street. Complainant could see this man's face as they walked, because his face was uncovered and the sidewalk was illuminated by street lights. She testified at trial that the man she saw was the defendant, Richard Rose.

When they reached 118th Street, they turned west. While they walked west on 118th Street, defendant repeatedly said, "Always been a white bitch but tonight its got to be a black bitch." Complainant at one point tried to pull away, but defendant stuck the gun further into her side and said, "Motherfucker, if you try anything, I'll hurt you."

Defendant took her to a garage located in the backyard of a house near 117th and Lafayette Streets. There were no lights in the garage, but defendant had a white plastic flashlight which he used while they were inside. Defendant kept peering out the window of the garage, telling complainant he was looking for two men, one of whom defendant said was named "Brown." After a short time, they left the garage and went around to the front of the house, which was two stories, boarded up on the first floor, and with several broken windows on the second floor. They went into the house through a basement entrance. Defendant took her to a rear staircase and then ordered her upstairs to the second floor. When they reached the second floor, defendant told her to go over to a window and see if two men were outside. When complainant did not move, defendant grabbed her and pulled her over to the window. Defendant was unable to see anyone when he looked outside.

Complainant testified that defendant took her to a rear bedroom and ordered her to undress. When complainant refused, defendant told her if she did as he asked, she would not be hurt. Defendant held his gun on complainant while she undressed. Defendant next told her to lie down and said if she did not, he would hurt her. Complainant lay down on the floor and defendant had intercourse with her.

Afterwards, defendant ordered her to get dressed. When she had dressed, defendant told her he was taking her to another building to meet the two men he had previously been looking for that evening. Defendant told her that if these two men identified her, they would kill her.

Defendant took her down the back stairs and outside the house. They walked west along 118th Street until complainant recognized a school-house and realized she was not far from her own home. She pulled away from defendant and ran north on Perry Street, but slipped and fell at an alley entrance. Defendant caught her and said, "Motherfucker, you shouldn't have did that." Defendant hit her with his fist on the head and on the jaw and they both fell to the ground. They fought with each other. As they got up, defendant took her purse, which contained $60, including two $20 bills. Complainant then broke away and ran west down the alley. Defendant screamed at her, "Motherfucker, if you run, I'm going to kill you; motherfucker, if you run, I'm going to kill you."

Complainant ran to her home, where James Lindsey answered the door. When complainant told him she had been raped, he ran outside and she immediately called the police.

The police arrived five minutes later and she told them she had been raped. She described her assailant to them as a black man, dark complexioned, who was approximately 30 to 32 years old, weighed 165 to 170 pounds, and was wearing both a dark knit cap as well as a dark knee-length coat. After this, she and Officer Pierce went to the house where the rape occurred and were joined by Officer Fitzmaurice, who interviewed her. She then went with Officer Pierce to Roseland Community Hospital, where a doctor treated her for a bruise on her face and took a vaginal smear. Her panties were taken from her at the hospital. Officer Pierce corroborated her testimony.

Following her treatment at the hospital, she went to the Roseland Police District station. There she was interviewed and then, accompanied by Assistant State's Attorney Michael Carey, viewed a lineup of five men, all black, all about the same height. Complainant testified that she identified defendant at the lineup as the man who raped her. Carey corroborated complainant's identification of defendant at the lineup.

It was stipulated that if the doctor who examined complainant was called as a witness, he would testify he treated her for a forehead bruise, as well as a contusion of the lower lip, and also made a vaginal examination and prepared vaginal smears. It was further stipulated that if the microanalyst who had examined the vaginal smears and complainant's panties was called as a witness, he would testify that sperm was on both the vaginal smears and on the panties.

Chicago police officer James Fitzmaurice testified that around 10:30 on the night of January 10, 1976, he went to a house near 118th and Lafayette Streets. There he met complainant and discussed the rape with her, after which he went into the house through a front basement door. He walked up the rear staircase to the second floor and noticed the windows there were broken. After he left the house, he and his partner patrolled the area. Around 11 or 11:15 p.m. on January 10, 1976, while in the vicinity of the crime, they saw a black male standing at the corner of 119th and Lafayette Streets. This man appeared to be between five feet six inches to five feet eight inches tall, weighed approximately 150 to 160 pounds, and was wearing both a long dark coat and a navy skull cap. Officer Fitzmaurice approached this man, whom he identified at trial as defendant, and conducted a protective search. He patted down defendant's coat and recovered a toy plastic gun, a white plastic flashlight, a knife and $54 in currency, including two twenty dollars bills, one ten, and four singles. Officer Fitzmaurice stated that the plastic gun resembled a snub-nosed revolver and that the knife looked like a kitchen steak knife.

Chicago police officer Peter Dignan testified that on the night of January 10, 1976, he went to the Roseland Police Station, where he

interviewed defendant. He told defendant he was under arrest for rape and gave defendant his *Miranda* warnings. Then he showed defendant the plastic gun, the flashlight, the knife and the $54. He asked defendant why he was carrying the gun and defendant said, "I don't know why." He asked defendant why he was carrying the knife and the flashlight and defendant said, "I'm just carrying it." He asked defendant where he got the money and defendant said he just had it, but did not remember where he got it, and that he had spent some money that night on an alcoholic beverage. Dignan also testified that before he ever talked to complainant, the defendant told him that he resided at 11818 S. Lafayette with a man named "Brown." He further testified that after he interviewed defendant, he arranged for a lineup involving defendant and four other individuals with physical characteristics similar to defendant's. When the lineup was conducted, complainant pointed to defendant as the man who raped her, and then complainant ran out of the room.

Defendant's sister, Estella Wilson, testified that on January 10, 1976, she and defendant lived with their mother at 11818 South Lafayette Street. That evening defendant left the house alone shortly after 6 p.m., and returned around 7 p.m. After he returned, she played checkers and watched television with him until approximately 9:45 or 10 p.m., at which time they left the house together to go to the drugstore a block from their home. They reached the drugstore and she went in by herself. When she came back outside, she saw that her brother had been arrested.

Defendant's mother, Marcella Long, testified that on January 10, 1976, she was living with defendant and her daughter at 11818 South Lafayette. Defendant left the house that evening between 6 and 7 p.m., but returned within thirty minutes. At around 8 or 8:30 p.m., defendant and her daughter left the house together to go to the Jewel Food Store. She had told defendant and her daughter she wanted them to go to the store for her before it closed at 9 p.m. Her daughter returned home alone around 10 p.m. and told her that defendant had been arrested.

■■ Defendant's first contention is that the trial court erroneously denied him a hearing and a ruling on a motion to quash his arrest and suppress evidence. We have examined the record and find that the trial court's disposition of defendant's motion was proper, because defendant failed to meet the statutory requirement that all such motions "be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." Ill. Rev. Stat. 1975, ch. 38, par. 114—12(c).

■■ Even assuming that defendant's motion was timely filed and that the trial court should have held a hearing and ruled on the merits, failure to do so was not reversible error. A trial court's failure to conduct a pretrial hearing on a motion to suppress is not reversible error, even if a pretrial

hearing would have been preferable, when upon the entire record the evidence shows that defendant was not deprived of the constitutional or legal rights assertedly denied. (*People v. Wade* (1979), 71 Ill. App. 3d 1013, 389 N.E.2d 1230, *appeal denied* (1979), 75 Ill. 2d 593.) Defendant was not so deprived here.

In his motion to quash and suppress, defendant stated that the police lacked sufficient grounds to arrest him and asked that the physical evidence recovered from him, as well as his in-custody statements to Assistant State's Attorney Carey and Officer Dignan, be suppressed.

■ A police officer may stop and question "any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person * * * has committed an offense" (Ill. Rev. Stat. 1975, ch. 38, par. 107—14) and may search the person for weapons if he reasonably believes that he is in danger of attack (Ill. Rev. Stat. 1975, ch. 38, par. 108—1.01). For a stop to be proper, there must have been specific and articulable facts which, together with inferences from those facts, reasonably justify the stop. (*People v. Garza* (1976), 44 Ill. App. 3d 30, 357 N.E.2d 1264.) A police officer's stop and frisk of a suspect may be proper under circumstances which would be insufficient to establish probable cause for an arrest. (*People v. Blakes* (1977), 55 Ill. App. 3d 654, 370 N.E.2d 869.) In addition, probable cause may be established on the basis of all information possessed by policemen working in concert. See *United States v. Stratton* (8th Cir. 1972), 453 F.2d 36, 37, *cert. denied* (1972), 405 U.S. 1069; *People v. Walker* (1977), 45 Ill. App. 3d 627, 360 N.E.2d 64; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.

■ We have carefully reviewed the record to make certain that defendant's arrest was legal. (See *People v. Wade* (1979), 71 Ill. App. 3d 1013, 389 N.E.2d 1230, *appeal denied* (1979), 75 Ill. 2d 593.) Based on the testimony of complainant and police officers Pierce and Fitzmaurice, we conclude that the stop of defendant was proper. In addition, once the gun and flashlight were discovered in defendant's possession, probable cause to arrest existed.

Defendant was not prejudiced by the trial court's action with reference to his motion to quash and suppress.

Defendant's second contention is that the trial court committed reversible error by failing to rule or conduct a hearing on his motion to exclude as impeachment evidence his prior conviction of indecent liberties with a child. The record indicates that on December 8, 1976, defendant filed a written motion *in limine* to exclude his prior conviction as impeachment evidence. On that same day, after the State had finished presenting its case, defense counsel asked for a ruling on the motion. The

following discussion between defense counsel and the trial court took place:

"COURT: I will not rule on the motion in limine at this time.

PUBLIC DEFENDER: Judge, are you requiring us then first to have the defendant testify at the jeopardy of having the possible [*sic*] conviction introduced?

COURT: I am not requiring you to do anything, * * *. I am allowing you to proceed with your case. And before the State has an opportunity to rebut the evidence in the Defense' case, if you wish at that time, I will rule on the motion. But, at this time, there is no indication that the defendant has testified. And until that time, the State is barred from using this testimony in all respects.

The motion to bar the use of that testimony at this time will be denied.

PUBLIC DEFENDER: Okay. That's all I have at the present time, your Honor."

Later that day, after defendant's two witnesses had testified, defense counsel and the trial court had the following discussion concerning the motion:

"PUBLIC DEFENDER: Judge, I'd just like to clarify a motion we previously filed in the nature of a motion in limine to bar a conviction in terms of being used against the defendant, should he testify, to impeach his credibility. I'm not clear on whether the Court ruled on that motion at that time—

COURT: I indicated that I would not hear it at that time.

PUBLIC DEFENDER: Judge, we're asking for a hearing on it at the present time.

COURT: I'll deny that at this time.

PUBLIC DEFENDER: All right. Judge, it is our intention to rest now then.

COURT: Okay."

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, the supreme court held that evidence of a prior conviction may be admitted to impeach a witness when the following three conditions are met: (1) the prior conviction was punishable by death or imprisonment in excess of one year, or was a crime involving dishonesty or false statements; (2) the date of conviction or the date of release of the witness from confinement, whichever is later, is not more than 10 years prior to the trial; and (3) the trial court in its discretion must determine that the probative value for impeachment purposes of the prior conviction outweighs any unfair prejudice its admission may have for the defendant.

Defendant admitted in his written motion that the first two

conditions for admissibility were met. In support of his argument that it was error not to rule or conduct a hearing on his motion, defendant contends he was entitled to know prior to testifying whether his prior conviction could be used against him, in order that he could take this into consideration in deciding whether to testify. Defendant urges that several decisions have mentioned that one of the factors a trial court may consider in deciding whether to admit a prior conviction is the likelihood that its admission will discourage a defendant from testifying. See, *e.g., People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.

The State argues that the trial court did rule on the motion, denying it without prejudice to the defendant to renew it after he had testified. The State contends this was a proper exercise of discretion by the trial court. Defendant maintains that the trial court could not have made a ruling, as the court did not have enough information to make a ruling because no hearing was held on the motion and that the failure to hold such a hearing was itself error.

The record is unclear whether the trial court intended to rule that it was denying defendant's motion without prejudice to renewing it after defendant testified, but whether the court did or did not so rule, no error was committed. The denial of a motion to exclude a prior conviction as impeachment evidence without prejudice to renewing the motion after defendant has testified is proper. (See *People v. Spicer* (1976), 44 Ill. App. 3d 200, 358 N.E.2d 104.) The record shows that defendant's written motion contained sufficient information to allow the trial court to exercise its discretion in making such a ruling regardless of whether a hearing was held at that time.

■■ If the court did not so rule, but instead intended only that it would rule after defendant testified, no error was committed. The effect of the court's action was the same as if the court had in fact denied the motion without prejudice to renewing it after defendant testified. Furthermore, a trial court may refrain from making *any* ruling on a motion to exclude a prior conviction as impeachment evidence until after the defendant has testified. In *People v. Barksdale* (1974), 24 Ill. App. 3d 489, 496, 321 N.E.2d 489, *appeal denied* (1975), 58 Ill. 2d 594, the court said:

> "* * *. The defendant contends that * * * the court [lacked] discretion to wait until the defendant * * * testified before deciding on the admissibility of the prior convictions. * * * The court [however] may be in a better position to ascertain the probativeness and prejudicial effect of such evidence after it has heard the defendant's testimony. We are of the opinion that a trial court should have the discretion to withhold its ruling on a motion to suppress the admission of prior convictions until the defendant has testified."

Because the trial court was not required to rule on the motion until defendant testified, there was no necessity to hold a hearing on the motion before that time.

Defendant's third contention is that it was reversible error to admit evidence that following *Miranda* warnings defendant invoked his right to remain silent.

Michael Carey, an assistant State's Attorney, testified that on January 11, 1976, at about 2:15 a.m., he saw defendant at the Roseland Police Station and gave him his *Miranda* warnings. He then asked defendant where he had been around 7 or 8 o'clock that evening. Defendant answered that at 7:30 p.m. he had gone to a National Food Store and had then driven around the west side of Chicago for a while. After this, defendant had gone to see a friend named Brown, who lived somewhere on Wentworth Avenue, the exact address he was not sure of. Only Brown's daughter was there, so he left, but when he was coming home he was arrested.

Carey further testified that when he interviewed defendant, he had had no conversation with complainant about a man named "Brown" and said nothing suggestive to defendant about a man named "Brown." Mr. Carey further testified that during the interview he had the plastic gun, the flashlight and the knife which had been recovered from defendant, and that

> "I asked him about the flashlight. I asked him whose flashlight it was. And he said it was his. I asked him, 'Did you have it with you when you were arrested?' He said, 'Yes,' he did.
>
> I asked him about the steak knife. I asked him did he have that when he was arrested. He said, 'Yes,' he did. I said, 'Whose knife is it?' He said, 'It's mine.' I asked him why he carried it. He said, 'I just carry it. It's just mine.'
>
> I then asked him about the black gun. I asked him if this was his. And he said, 'Yes.' I asked him where he got it. And he said, 'I got it from Brown and I was going to give it to my sister's children.' Then I said, 'Well, when did you get the gun?' And he said, 'I got it tonight.' I said, 'I thought you told me that you hadn't talked to Brown tonight.' Then he said, 'I don't want to talk to you any more.'
>
> Q: He had previously told you that he hadn't seen Brown, is that correct?
>
> A: That's correct."

Defendant argues that Carey's testimony that defendant told him, "I don't want to talk to you any more," was error under the United States Supreme Court's holdings in both *Doyle v. Ohio* (1976), 426 U.S. 610, 49

L. Ed. 2d 91, 96 S. Ct. 2240, and *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 694, 86 S. Ct. 1602.

■■ We disagree that this was a *Doyle* violation. Unlike the situation in *Doyle*, this was not an attempt by the prosecutor to impeach exculpatory testimony by a defendant, related for the first time at trial, by cross-examining the defendant about his silence after receiving *Miranda* warnings. Although not a *Doyle* violation, the statement attributed to defendant did amount to an exercise by defendant of his right to remain silent, a right which defendant was entitled to invoke at any time during the interview. Under *Miranda v. Arizona* (1966), 384 U.S. 436, 486, n. 37, 16 L. Ed. 2d 694, 720 n. 37, 76 S. Ct. 1602, 1624-25 n. 37, it was error for the prosecutor to introduce evidence concerning this statement by defendant. "[T]estimony relating [to] exercise of *Miranda* rights by a defendant under interrogation chills those rights guaranteed by the fifth amendment to the United States Constitution and is therefore error of constitutional magnitude." *People v. Tice* (1977), 45 Ill. App. 3d 639, 641, 359 N.E.2d 1228.

But error of constitutional magnitude may be harmless beyond a reasonable doubt. (*People v. Lewis* (1977), 51 Ill. App. 3d 109, 366 N.E.2d 446.) It is apparent from the portion of the record set out above that it was not the prosecutor's intent to elicit from Carey the fact that defendant had invoked his right to remain silent; rather, this evidence was introduced merely as part of a fairly long narrative response by Carey to a broad question concerning Carey's interview with defendant. In addition, the prosecutor in his follow-up question did not refer to defendant's assertion of his right to remain silent, nor does defendant claim that the prosecutor, either in the evidence or in argument, emphasized the fact that defendant exercised this right. In fact, at the time defendant's statement was introduced, defendant made no objection. Furthermore, the evidence of defendant's guilt was so strong that any error in the admission of Carey's testimony was harmless beyond a reasonable doubt. See *People v. Anthony* (1976), 38 Ill. App. 3d 190, 347 N.E.2d 179; *People v. Mitchell* (1973), 12 Ill. App. 3d 960, 299 N.E.2d 472.

■■ Defendant's fourth contention is that the evidence concerning the knife which the police recovered from him should not have been admitted at trial. Defendant's argument is based on the fact that complainant only testified that defendant had threatened her with a gun, and never stated that defendant had used a knife. Defendant's argument ignores the fact that one of the crimes with which he was charged was armed robbery. Evidence concerning the knife was admissible against defendant on that charge, even though the knife may not have been seen or described by complainant.

In *People v. Elam* (1972), 50 Ill. 2d 214, 278 N.E.2d 76, the defendant demanded money from a bus driver and told the driver he was holding a gun on his back. When defendant was apprehended shortly afterwards, a knife, but not a gun, was found on him. Defendant was subsequently convicted of armed robbery. He argued on appeal that he should not have been convicted because only the knife, and not the gun with which he allegedly had threatened the driver, had been found on him. The court rejected this argument, stating that when a person commits robbery while armed with a dangerous weapon, he is guilty of armed robbery. The court concluded that "the knife in question was a dangerous weapon and * * * the actual existence of a dangerous weapon in the possession of the accused at the time of the robbery was sufficient to fulfill the requirements of the [Criminal] Code even though the weapon itself was neither seen nor accurately described by the victim." *People v. Elam* (1972), 50 Ill. 2d 214, 220, 278 N.E.2d 76.

In *People v. Upshire* (1978), 62 Ill. App. 3d 248, 379 N.E.2d 38, *appeal denied* (1978), 71 Ill. 2d 620, the court said (62 Ill. App. 3d 248, 252):

> "* * * [T]he admission into evidence of the loaded shotgun and sword found in the trunk of the auto was proper. Even though a particular weapon was not used by the accused during the commission of the crime, it may be the subject of testimony concerning the details of the arrest and may be admitted into evidence. (*People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529.)"

In the case before us, the knife was in defendant's possession when he was stopped. Further, defendant could not have been prejudiced by the admission of the evidence concerning the knife. He was found guilty of armed robbery and there is no claim that he was not proved guilty beyond a reasonable doubt on the charges of rape and robbery.

■■ Defendant's fifth contention is that it was improper for the trial court to sentence him to consecutive sentences for rape and for robbery because these offenses "were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4(a).) We disagree. The evidence shows that the rape and robbery were two separate and distinct courses of conduct, and that rape was defendant's objective at the time he accosted complainant and, after the rape had been accomplished, that robbery became defendant's new objective when he caught complainant following her unsuccessful escape attempt. Consecutive sentences were properly imposed. See *People v. Brown* (1975), 31 Ill. App. 3d 547, 334 N.E.2d 323.

Finally, defendant argues that in imposing consecutive sentences for rape and robbery the trial court ignored the following statutory provision (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4(b)):

"The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court may set forth in the record."

The record shows that during the sentencing hearing the trial court considered the fact that defendant had previously been convicted of indecent liberties with a child and had been imprisoned for that conviction after violating his probation. The trial court was also aware that defendant raped and robbed complainant only six weeks after he had been released on parole for his indecent liberties conviction.

"A trial court's determination to make a sentence run consecutively * * * is a matter of discretion in light of the nature and circumstances of the offense, the history and character of the defendant, and the need to protect the public from future criminal conduct by the defendant." (*People v. Chicon* (1977), 55 Ill. App. 3d 100, 107, 370 N.E.2d 605.) "If the record discloses that prior efforts by courts or correctional facilities have failed to accomplish the objective of deterrence or rehabilitation, it becomes evident that the imposition of a consecutive sentence by the trial judge has for its purpose the protection of the public from further criminal conduct by the defendant." *People v. Reed* (1977), 51 Ill. App. 3d 479, 483, 366 N.E.2d 1137.

We have reviewed the record and find no abuse of discretion by the trial court in imposing consecutive sentences on defendant for rape and robbery.

The convictions and sentences are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.