THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ISRAEL DIAZ *et al.*, Defendants-Appellants.

First District (4th Division)    No. 79-1544

Opinion filed November 5, 1981.—Rehearing denied November 30, 1981.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendants, Israel Diaz and Domingo Delgado, were convicted of the aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4) of Jerry Johnson. Defendant Diaz was sentenced to 30 months' probation and defendant Delgado was sentenced to a two- to five-year prison term. The original indictment charged defendants with three counts of aggravated battery upon each of three victims, Jerry Johnson, Paul Hermanson and John Doyle. Prior to trial, the State entered *nolle prosequis* on the original indictment and reindicted defendants with one count of aggravated battery while armed with a deadly weapon (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(b)(1)) and one count of aggravated battery causing great bodily harm (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(a)) upon each of the three victims.

On appeal defendants contend: (1) they were not proven guilty beyond a reasonable doubt; (2) the trial court improperly refused to instruct the jury on justifiable use of force; (3) defendants were arrested without probable cause and, therefore, the trial court improperly failed to suppress their statements and the identification testimony; (4) the trial court erred in allowing the victims' identification testimony at trial since the pretrial confrontations were unduly suggestive; (5) the trial court improperly allowed impeachment of a defense witness with an old prior conviction.

We affirm.

*For the State*

Terry McCormick testified that on June 2, 1978, he and his friends, Jerry Johnson, John Doyle, and Paul Hermanson attended a Cubs baseball game. McCormick had not had anything to drink. While they were returning to Doyle's car, McCormick walked about 100 feet behind his three friends. As they proceeded on Addison Street, McCormick saw a pipe being thrown from a porch. The pipe landed behind his friends. Looking towards the porch, McCormick saw what he described as "a couple of Latino males." He identified one as the defendant Diaz. He did not see defendant Delgado on the porch. Neither McCormick nor his friends said anything; the incident of the pipe being thrown was unprovoked according to McCormick. He noticed that one of the persons on the porch walked through a gangway and was then out of eye-sight.

As McCormick and his friends walked along and turned the corner, McCormick said he saw a group of six to eight Latino males and possibly one white male. The men were carrying bats and metal pipes. Suddenly, and for no apparent reason, these men attacked McCormick's three friends. He described the height of the attacking men as varying between

five feet six inches and six feet. McCormick estimated he was between 50 and 75 feet away when he first saw the defendants. Delgado came west through an alley as Doyle and Johnson ran east through the same alley. Diaz and some of the other men chased Doyle and Johnson. Hermanson ducked under a car.

McCormick then left the area, found the police, and returned to the scene. McCormick had not seen any of his friends being struck. When he returned to the scene, he did not see any of the Latino males but he did see bats and pipes on the ground.

McCormick further testified that he went to the emergency room of the hospital where his friends had been taken and while he was there, he identified the defendants as two of the assailants. McCormick also stated that after the incident, he accompanied police while they searched the neighborhood for the other men. McCormick had given the police a brief description of the assailants. However, at the trial he could not recall the exact description he had given to the police. He did remember describing the sleeveless "tee shirts" which some of the assailants were wearing. He did not think that defendant Delgado had a beard at the time of the incident.

Paul Hermanson also testified that nothing was said to the assailants prior to the time the pipe was thrown at his group on their return from the baseball game. Hermanson did not know who threw the pipe but he did see defendant Diaz at the scene. Hermanson denied that he had told police the pipe was a mop handle. Hermanson also asserted that no one, at that point, swung the pipe at him although he acknowledged that he had told Officer Epplen that defendant Delgado came towards him with a pipe.

Hermanson further related that about one or two minutes after the pipe was thrown, he saw a "gang" of males, none of whom he knew, coming towards him. They were carrying bats and pipes. He observed defendant Delgado from a distance of one or two feet. Hermanson identified two bats at trial as being similar to the bats with which he was struck.

Hermanson further testified that when he told the group of assailants that he was just trying to get into his car, one of them smashed the windshield of the car. When Hermanson's friends ran away, three of the attackers, including defendants, remained and hit him with pipes and bats. Although he crawled under an automobile, the men continued to beat him about his ankles and legs as they yelled at him. He then crawled out from under the car. He denied hitting anyone although he defended himself against the attack. Defendant Delgado struck the back of his head. Hermanson first stated he did not see the defendants hit anyone but himself, but he then asserted that they struck his friends. He saw his friends being chased through an alley by a group of males, and the de-

fendants were in that group. Hermanson then ran for help. The police took him to a hospital where he received medical treatment. He later, while at the hospital, identified the defendants. Hermanson described Delgado as having been beardless on the day of the incident.

Hermanson denied that he or his friends threw a bike at defendant Diaz or hit defendant Delgado. He recalled that he might have given police a description of defendants, but he did not think he did. At trial, Hermanson identified the blood-stained tee shirt which had been torn off him during the attack. Hermanson described himself as six feet tall and asserted that on the day of the incident, he weighed 175 pounds. Hermanson also noted that Doyle was about the same size, while McCormick and Johnson were heavier and taller.

John Doyle also testified that nothing was said by members of his group prior to the assault. He had noticed defendant Diaz on a porch, but he did not see anyone with him. A pole was thrown towards him and then a group of people, carrying bats and pipes, came from "out of nowhere, from all different directions." Defendant Diaz and another man struck Doyle with a baseball bat. Doyle attempted to defend himself. He was not armed. None of his friends were armed. Doyle was struck on his forearm and head with a bat or pipe held by Diaz and another man. Doyle and Johnson then ran through an alley. They stopped to wait for their friends, but then Diaz, Delgado and another man chased them. Delgado hit Johnson over the head with a lead pipe. After Johnson fell, Delgado struck him across the face with a pipe. Doyle aided Johnson and then saw defendants flee. The whole incident lasted between three and five minutes.

Doyle further asserted that he saw defendants in the lobby of the hospital where the police had taken him. He spoke with investigators that day but he did not tell them that Delgado had never hit anyone. Doyle asserted he told investigators that Delgado had hit someone in the face. He could not recall any descriptions which he gave the police.

Jerry Johnson also testified to the events surrounding the incident. After a steel pole was thrown from a porch behind his friends, he looked in the direction of the porch and saw three men. He identified one of the men as Diaz. He also asserted that nothing was said before the pole was thrown.

Johnson further related that he and Hermanson were surrounded by six men, including defendants. The men were carrying bats. Diaz came from the porch or gangway area, and Delgado came from across the street with several others. Johnson did not see Delgado carrying a pipe.

Johnson further stated that after the group began swinging bats at him, he and Doyle ran through a nearby alley. He did not observe Doyle wrestling with anyone since he himself was being attacked. Johnson was

hit three times on the head prior to attempting to escape by running through the alley. He did not know who hit him but the defendants were present during the assault upon him. He was again struck while he was in the alley. Two of the three men who attacked him were the defendants and they had bats and poles in their hands.

Johnson was taken to a hospital where he received 100 stitches for his head wounds. He also had a broken nose and cheekbone which required treatment throughout the summer. He did not recall any questioning by police or giving a description of the offenders to the police. Johnson stated that Delgado did not have a beard at the time of the incident. Johnson was 6 feet 1½ inches tall, and he weighed 195 or 200 pounds at the time of the incident.

Officer Roger Wilson testified that on June 2, 1978, at 4:30 p.m., he and his partner, Joseph Parisi, received a radio call of a battery in progress. They arrived at the scene about the same time as Officers Catalano and Norman. He observed people lying on the ground. They were bleeding from head wounds. He also saw a pipe, a couple of bats, a fence post, and sticks on the ground. He arranged for the injured to be transported to the hospital and "very hurriedly" interviewed Johnson, Doyle, McCormick, and Hermanson. The victims described their assailants as a group of six or seven male Latinos armed with baseball bats and lead pipes. One of the subjects was described as five feet five inches to five feet eight inches tall who weighed about 190 pounds, had a stocky build and dark hair styled in an "afro." Another assailant was described as being between five feet two inches to five feet five inches tall and weighing 140 pounds, with a dark complexion and dark hair. Both subjects wore tee shirts and "wash pants" and were between 17 and 25 years of age. These descriptions were recorded in the police report. Wilson was told that the cause of the incident was that a stick had been thrown and uncomplimentary language had been exchanged. Wilson observed pipes and bats on the ground.

Wilson further testified that he and his partner searched the area where the incident occurred for about 10 minutes. While driving past the schoolyard across the street from where the incident took place, Wilson saw Delgado sitting on a bench near a shelter house. He was wearing a short sleeve tee shirt and wash pants. When Wilson approached Delgado, he observed Delgado washing his hands in the shelter house sink and rinsing off what appeared to be blood from his hands and forearms. Wilson saw that Delgado had spots on his shirt, a bump on his forehead, a mark below his left eye, and a small tear in his pants.

Wilson then asked Delgado to accompany him to the hospital. Delgado agreed and was cooperative. Wilson asserted that Delgado was not

placed under arrest and he was not asked any questions. When Wilson turned the squad car around the corner, he saw two men walking down the street. One of the men was Diaz, who had blood and a fresh band-aid on his hand. Diaz was wearing a tee shirt and wash pants. When Wilson stood next to Diaz, he saw blood on Diaz' neck. Diaz was asked to go to the hospital, and he also agreed to do so.

Wilson further testified that he brought the suspects to the hospital because the victims' condition was questionable and he wanted the victims to view the suspects. At the hospital, McCormick was standing in the lobby. Wilson and his partner were standing behind the defendants and a third suspect, James Peterson, as they entered the hospital. Before the police said anything, McCormick identified the suspects as the men who had attacked his friends.[1] The defendants were handcuffed and Wilson left defendants in Officer Norman's custody. Wilson asserted that he later returned to the area where the incident occurred and he recovered the baseball bats which were later identified at trial. It was stipulated that the defendants' fingerprints were not detected on the baseball bats.[2]

Assistant State's Attorney James Davidson testified that after advising defendants of their *Miranda* rights, they each explained what had happened. Diaz stated that he heard someone call him a "nigger," and he ran into a basement to get a mop. When he returned to the area, he saw four or five males standing on the sidewalk. Diaz ran after them and threw the mop at them. As he ran away, he tripped over a bicycle and fell on his face hurting his knee and mouth. He looked up and did not see anyone in the street. He went to his friend's home where he was later arrested.

Delgado told Davidson that he had been playing basketball at the schoolyard when he saw Diaz lying on the ground with five or six men standing over him. Delgado crossed the street and asked them to stop beating Diaz. One of the men then punched him and he walked back across the street. He had nothing in his hand at this time. He had scratched his knee when he fell while playing basketball; there was no blood on his knee or his face. Davidson could not describe Delgado's clothing but he thought Delgado had scratches on the back of his neck.

---

[1] At the pretrial hearing, Wilson's partner, Joseph Parisi and another police officer, Arthur Norman, testified that Hermanson was the first person to identify defendants at the hospital.

[2] Officer Parisi's pretrial testimony concerning his investigation of the incident was substantially similar to Wilson's testimony. Officer Norman also testified that he brought the three suspects into an area near the emergency room lobby. Their hands were handcuffed behind their backs. Norman told Hermanson and Doyle to come with him and see if anyone in the room was an offender. Hermanson and Doyle walked past the room where a guard was posted and then returned to Norman, identifying the defendants and another man as their assailants. The defendants then were transported to the police station.

*The Defense*

Diaz testified that at 4 p.m. on June 2, 1978, he was sitting on a building porch. Three girls were sitting on another porch about 10 feet away. He knew two of the three girls. Four or five males walking near the porches said something unpleasant about the way the girls looked; they "got fresh." The girls began screaming. Diaz first asserted he told the men to calm down and then later he stated that he did not say anything to them. One of the men whom Diaz could not identify called Diaz a "nigger" and a "bum."

Diaz further testified that he went into a gangway to get a mop. When he returned, he threw the mop at the group of men. No one had said anything. Diaz related that he was angry but also afraid since the men were much taller and heavier than he. He only intended to "hit and run" with the mop although actually he did not hit anyone with it.

One of the men then picked up the mop and ran towards him "like to swing it" at him. Diaz ran through a gangway and another man threw a bicycle towards him and he fell over it, hitting his head on the ground. He tried to get up but was "jumped" by someone and he fell on his face. He did not remember if anything was said at this time. He was knocked unconscious and when he revived he felt dizzy. When he was able to stand up, he did not see any of the males involved in the incident in the area. He asserted that he had never hit anyone with any bats or pipes.

Diaz, who was bleeding, then went home. About 4:40 p.m., he was arrested by police officers who asked that he approach their squad car. They grabbed his hand, asked him about a scratch on his hand, and then ordered him into the squad car. Delgado already was in the squad car. They drove to a hospital. A man brought out to view them pointed at them. The police then "slammed" his head against another man's head. Diaz was then handcuffed and brought to a jail cell where Davidson questioned him about the incident. Diaz could not remember telling Davidson that he was injured when he ran and tripped over a bike.

Diaz denied that he had blood on his hands or arm but admitted that he had blood on the back of his neck. The blood on his shirt was his own blood. Diaz asserted that when he encountered Delgado in the police squad car, Delgado had bumps on his head and over his eyes which were discolored but not bleeding. Diaz also denied chasing the complainants into an alley or hitting them with bats, pipes, or a mop handle. He further stated that he never saw Delgado with a bat.

The stipulated testimony of Officer Catalano was read to the jury. He prepared a police report in which he noted that Delgado and Hermanson had been drinking and he left blank a space which, if marked, would indicate the descriptive word, "sober."

Delgado testified that on the afternoon of the incident, he went to a schoolyard located near Addison Street and played basketball. At 4:30 p.m., he was sitting on a bench with a friend. He was not injured, but his pants may have been torn. He was about 25 feet from the street. He saw a crowd in the street and heard Debra Peterson screaming. He saw people "struggling" but he thought they "were playing around." He saw Diaz lying on the ground. When Delgado crossed the street, he saw a 6-foot male standing over Diaz "roughing him around" and holding him down. Nothing was said as he approached the scene. Delgado attempted to get the man away from Diaz by grabbing the man's shoulders. Someone else then punched him. Delgado stumbled, and hit his head on a sign post. Someone else hit him in his eye and he staggered back to the schoolyard. He did not look back.

He sat on a bench near a shelter and then asked the manager for some ice. He then went into the shelter house and began washing his hands to clean them before using the ice. There was no blood on his hands.

After a minute, police approached him and told him to come with them. He did so. When Officer Wilson asked Delgado how he had been injured, Delgado explained it had happened while playing basketball. He was then taken to the squad car, handcuffed, and placed inside the squad car. Although there were other male Latins around being questioned, they were not detained. The police drove around the neighborhood and picked up Diaz and Peterson. Diaz and Peterson were not handcuffed while they were in the squad car. Delgado did not observe blood on Diaz, but he did notice that Diaz' nose was swollen.

After being taken to the hospital, he, Diaz and Peterson were asked to stand along a wall. A blond-haired white male, McCormick, identified them as the assailants. Other white males then identified them as well.

Delgado further asserted he had had a beard since 1975. On the day of the incident, he was wearing blue pants and a tee shirt with sleeves. He neither had a pipe or bat nor saw Diaz with a bat, pipe or mop. Delgado also did not see Diaz strike Hermanson, Johnson or Doyle.

Eric Peterson testified that on the afternoon of June 2, 1978, he was outside and saw five white males "horsing around." His daughter and two other girls were sitting on a building porch. The males "got kind of nasty" and told his daughter she would be cute when she became older. The males became loud and reached for his daughter's hand to pull her down the stairs.

Diaz, who was sitting on a nearby porch, spoke to the group of white males. One of the males called Diaz a "nigger." One of the white males suggested "getting" Diaz and they started to walk up the stairs. Diaz ran down the stairs toward the men, threw a mop at them, and ran. Diaz was

tackled by the man who had called him names. Diaz fell on his face. One of the white males picked up a bicycle and began swinging it around. All of the white males were bigger than Peterson.

Peterson tried to help Diaz but was "jumped" and the mop handle was broken over his neck. When his daughter screamed, he saw Delgado grab one of the men standing over Diaz and they began to fight. The man punched Delgado and he fell into a post, hitting his head. Delgado staggered back towards the schoolyard. Both Peterson and Diaz were being beaten when other people, including Peterson's son, came to help stop the fighting. It was a "free-for-all." Peterson said he helped Diaz get away.

After the police arrived, Peterson went to the police station to see if his son had been arrested. His son was "locked up" with Diaz and Delgado. He noticed Diaz had blood on his mouth. Delgado was wearing a beard. Peterson asserted that he never saw any bats or pipes on the day of the incident.

Judy Ogata testified that on June 2, 1978, at about 4:30 p.m. she was sitting on a porch with Debra Peterson. Diaz was sitting on a nearby porch. Four white males, each about six feet tall, and each of whom was bigger than Diaz, told Debra she would be a "fox" when she became older. Neither Diaz nor the girls said anything. As the white males kept walking, they yelled at Diaz, calling him a "nigger" and a "bum" and moved up the porch towards him. Diaz ran to the gangway and grabbed a mop. One man "seemed" to prompt Diaz into a fight. Another man threw a bicycle at Diaz. Debra Peterson "jumped on" the back of this man and Ogata then went into her house.

Ogata asserted she did not see Delgado before she went inside the house. She also did not observe Diaz with a bat or pipe.

Ruth Delgado, defendant Delgado's sister, asserted that Delgado had a beard on June 2, 1978.

*Rebuttal*

Officer Wilson testified in rebuttal that when he encountered Delgado in the shelter house, Delgado told him he was washing up because he had injured himself while playing basketball.

*Verdict and Sentence*

The jury returned guilty verdicts on the charges of the aggravated battery of Johnson but acquitted defendants of these charges against Hermanson and Doyle. The court entered judgment on the verdicts and sentenced Diaz to 30 months' probation and Delgado to a two- to five-year prison term.

Opinion

I

Defendants first contend that they were not proven guilty beyond a reasonable doubt of aggravated battery of Jerry Johnson. Defendants argue that the State failed to present any testimony "persuasively demonstrating" that either Diaz or Delgado personally injured Johnson. Defendants urge that since Doyle testified that only Delgado struck Johnson there was no evidence that Diaz committed an aggravated battery. Defendants also maintain that since the jury acquitted defendants of the charge of the aggravated battery of Doyle, Doyle's testimony is inherently incredible. We disagree.

The aggravated battery indictments charged defendants with committing a battery with a deadly weapon (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(b)(1)) and committing a battery while knowingly and intentionally causing great bodily harm (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(a)), and the jury was so instructed. The jury also was instructed on accountability as follows:

"A person is responsible for the conduct of another person when, either before or during the commission of a crime and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid, the other person in the planning or commission of the crime."

At trial, Johnson testified that he saw Diaz approach him with a bat in his hand. Delgado, armed with a bat, also came towards him from across the street. As Johnson and Doyle ran through the alley, defendants and another man pursued them. Johnson was struck with a bat from behind by one of the men. He fell and was hit with a pole across the left side of his face. He was unable to see who had actually hit him.

Doyle also testified that Diaz and another person accosted him with a baseball bat. After he and Johnson ran through an alley, defendants and a third party again attacked them. Delgado hit the back of Johnson's head with a lead pipe, and as Johnson fell, Delgado hit Johnson's face with a pipe.

In our view, the testimony of the complaining witnesses provided a sufficient evidentiary basis for the jury to find beyond a reasonable doubt that defendants were guilty of committing an aggravated battery upon Johnson. It is well settled that the testimony of even one witness, if positive and credible, is sufficient to convict, even though it is contradicted by the accused (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182), and the witness need not be the victim of the crime. (See *People v. Stallcup* (1973), 10 Ill. App. 3d 153, 294 N.E.2d 21.) It is for the trier of fact to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v.*

*Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) The evidence presented here was not so improbable or unsatisfactory to render it unworthy of belief. (*People v. Young* (1973), 12 Ill. App. 3d 310, 297 N.E.2d 578.) Minor discrepancies in a witness' testimony do not render the testimony incredible but rather affect the weight to be given that testimony. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Smith* (1978), 67 Ill. App. 3d 672, 385 N.E.2d 44.) A court of review may not substitute its judgment for that of the jury merely because conflicts in testimony raise factual issues which the jury resolved against defendant. *People v. Wilbert* (1973), 15 Ill. App. 3d 974, 305 N.E.2d 173.

■■ Although the testimony did not establish absolutely that Diaz personally struck Johnson, the jury was entitled to find that he was accountable for the injuries inflicted by Delgado. In Illinois, a person is legally accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c).) The testimony of both Doyle and Johnson demonstrated that Diaz' conduct aided Delgado's ability to inflict injuries upon Johnson. We believe there was sufficient evidence presented to the trier of fact to determine the issue of accountability as it did. (See *People v. Clifford* (1976), 38 Ill. App. 3d 915, 349 N.E.2d 922.) Based on the evidence presented, we conclude that the jury was entitled to find the defendants guilty of committing an aggravated battery upon Johnson beyond a reasonable doubt.

## II

Defendants next contend that the trial court improperly refused to instruct the jury on the justifiable use of force defense. Defendants maintain that they were acting to defend others and consequently "some evidence" of justifiable use of force was presented at trial. We disagree.

■■ Defendants and their witnesses consistently asserted that none of the victims had been struck. Section 7—1 of the Criminal Code of 1961 provides that:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another * * *." (Ill. Rev. Stat. 1977, ch. 38, par. 7—1.)

Self-defense and defense of other, the justifiable use of force defenses,

presuppose that the accused committed the act when a defendant invokes either defense as a justification for the act. (*People v. Hawkins* (1980), 88 Ill. App. 3d 178, 410 N.E.2d 309. See also *People v. Smith* (1912), 254 Ill. 167, 98 N.E. 281; *People v. Lahori* (1973), 13 Ill. App. 3d 572, 300 N.E.2d 761.)[3] The evidence presented by defendants in this case is insufficient to meet the minimal ("some evidence") required to warrant a self-defense or defense of other instruction. *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.

Defendant Diaz testified that after being called a name, he threw a mop at the complainants which did not hit them. Delgado asserted that he grabbed someone, but he did not testify that he used any force against the complaining witnesses. To require a justifiable use of force instruction under these circumstances would allow a defendant to demand unlimited instructions based upon the "merest factual reference or witness' comment." (*People v. Bratcher* (1976), 63 Ill. 2d 534, 541, 349 N.E.2d 31, 34.) If, as defendants asserted at trial, they never used any force against the victims, then it follows that they could not have reasonably believed force was necessary to protect themselves. "Raising the issue of self-defense requires as its sine qua non that defendant had admitted [the battery] as the basis for a reasonable belief that the exertion of such force was necessary." (*People v. Lahori* (1973), 13 Ill. App. 3d 572, 577, 300 N.E.2d 761, 764-65.) Since defendants denied committing the acts, and the State's evidence did not show that defendants' use of force was justified, the trial court properly refused the instruction.

## III

Defendants next contend that they were arrested without probable cause and therefore the trial court improperly failed to suppress their statements and the complaining witnesses' identification testimony.

A police officer has probable cause to effectuate an arrest without a warrant when the totality of the facts and circumstances within his knowledge are sufficient in themselves to warrant a reasonable and prudent person in believing that an offense had been committed and that the person arrested had committed it. (*People v. Henderson* (1974), 20 Ill. App. 3d 120, 312 N.E.2d 655.) The question of probable cause is one of probabilities, which are the factual considerations of everyday life on which reasonable persons, not legal technicians, act. *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329.

---

[3] The Random House Dictionary of The English Language defines self-defense as "A claim or plea that the use of force or injury or killing another was necessary in defending one's own person from physical attack." (The Random House Dictionary of The English Language 1293 (unabr. ed. 1966).) Black's Law Dictionary defines the defense as an "excuse for the use of force in resisting an attack on the person ° ° °." Black's Law Dictionary 1525 (4th ed. 1968).

A review of the record leads us to the conclusion that the facts known to the police officers at the time of defendants' arrests provided them with probable cause to arrest defendants. The trial court found that both defendants were arrested when they were taken into the squad car and transported to the hospital. The trial court also found that the descriptions obtained by the police officers which were broadcast over the police radio "were not in great detail." "They were wearing shirts * * *. Some effort was made to describe age and weight." The offenders also were described as "Latino" and "Puerto Rican." Defendants argue that the police officers' descriptions were too general to provide probable cause for their subsequent arrests.

A general description of a suspect is insufficient to provide probable cause necessary to justify an arrest unless it is supported by other relevant facts known to the arresting officer. (See *People v. Williams* (1977), 53 Ill. App. 3d 266, 368 N.E.2d 679.) Defendants attack the descriptions given by the police officers because the complaining witnesses either denied giving a description or could not recall with specificity the description given by them. Whether or not the description given was general is unimportant, in our view, because there were additional facts known to the arresting officers which provided probable cause to arrest defendants.

The trial court found that the arresting officers observed defendant Delgado sitting in a schoolyard adjacent to the area where the incident occurred. When they appeared, Delgado went into a building and Officer Wilson followed him. Wilson testified at trial that he thought Delgado fit the description given by the complaining witnesses. When Wilson approached Delgado, he saw splatters of blood on Delgado's arms and spots on his shirt. Delgado was washing off a substance from his arms and hands and the substance appeared to be blood. Wilson also observed an abrasion on Delgado's head and a tear in his pants. After Delgado accompanied Wilson to the squad car, Officer Parisi noticed fresh blood speckles splattered on Delgado's arms, legs, and shirt. Parisi also observed that Delgado had a bump on his forehead and under his eye. Based on these facts and the probabilities of life, we believe that a reasonable person would conclude that defendant Delgado was one of the assailants. *People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112.

■■ Similarly, we believe the police officers had probable cause to arrest defendant Diaz. The trial court, noting that the police knew about a bloody confrontation, found that Diaz had "fairly fresh" blood on him. Officer Wilson testified that Diaz had blood on his hand, neck, and arm and that Diaz had a band-aid on his hand. Diaz' physical appearance fit the general description given and Diaz was located near the scene of the confrontation. We believe a reasonable person would believe that Diaz was also an assailant, and therefore, his arrest was based on probable

cause. (*People v. Rose* (1979), 75 Ill. App. 3d 45, 393 N.E.2d 698; *People v. Lakins* (1977), 52 Ill. App. 3d 284, 367 N.E.2d 592.) Consequently, we hold the trial court properly denied defendants' motion to quash their arrest and suppress their statements and identifications.

## IV

Defendants next contend that the pretrial confrontations between the defendants and the complaining witnesses were unnecessarily suggestive and any evidence concerning them should have been suppressed. Defendants were brought to the hospital where the complaining witnesses had been taken for treatment. As they entered the lobby, McCormick identified them as the assailants of his friends. Later, while handcuffed and in a room in the hospital, defendants were viewed and identified by Doyle and Hermanson. In the evening, after the defendants were brought to the police station, Doyle and Hermanson again identified defendants. Defendants were not, however, identified from a lineup of other males.

While we agree that the identification procedures were suggestive, it is unnecessary, in our view, to reverse the cause because the record demonstrates that there is a reliable basis for the complaining witnesses' in-court identifications, which are independent of the out-of-court identifications.

As in *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861, the crux of the issue here is whether the complaining witnesses' in-court identifications of defendants were based on out-of-court identifications, which were so impermissibly suggestive as to create a substantial risk of irreparable misidentification. At the trial, here, as in *McTush*, both the State and the defense asked the complaining witnesses questions about their identification of defendants on the night of the incident. The *McTush* court noted the Supreme Court's rationale set forth in *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, that despite the hazards of such an identification, those hazards are substantially lessened by the opportunity afforded to defense counsel to cross-examine an eyewitness at trial and thereby expose any potential for misidentification.

Consequently, once it is established that the pretrial confrontation was impermissibly suggestive, the State may "overcome that obstacle, by a clear and convincing showing, based on the totality of the surrounding circumstances, that 'the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime. [Citation.]' " (81 Ill. 2d 513, 520, 410 N.E.2d 861, 865.) The concern is whether "an independent origin exists to establish separate reliability for [the complaining witnesses'] in-court identification testimony, or, negatively stated, whether the suggestive procedure created a substantial risk of misidentification, without a sufficient, separate basis of reliability." (81 Ill. 2d 513, 521, 410

N.E.2d 861, 865.) The factors to be considered in evaluating the likelihood of misidentification include the following: (1) the opportunity of the witness to view the alleged offender at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the confrontation; (5) the length of time between the crime and the confrontation; and (6) any acquaintance with the suspect at the time of the crime. *People v. McTush.*

Applying these factors to the case here, we believe that the complaining witnesses viewed defendants under circumstances which permitted a later positive identification of defendants. The incident occurred at 4:30 p.m. during the summer months. Although McCormick viewed defendants from a distance of 50 to 70 feet, Doyle, Johnson, and Hermanson observed defendants face to face for several seconds during the attack. Hermanson observed defendants when they struck him with pipes and again when they ran down an alley. Doyle was struck by Diaz and then wrestled with him for a few seconds. He also saw Delgado hit Johnson's head and face. These detailed descriptions of events support the inference that they were closely attentive to what was happening and "viewed [the scene] with the close attention accorded unusual occurrences." (*People v. McTush* (1980), 81 Ill. 2d 513, 522, 410 N.E.2d 861, 866.) The complaining witnesses also positively and consistently identified defendants first while they were at the hospital, second while they were at the police station, and third during the trial. The length of time between the crime and the out-of-court confrontations—a matter of hours—clearly was not unduly long so as to mar the strength of the identification.

■■ Finally, although at trial the complaining witnesses could not recall with exactness the descriptions they had given the police on the night of the incident, we do not believe this materially diminishes the reliability of the identification. In our view, "informed judgment" (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 513, 250 N.E.2d 152, 155) is inferable from the record that an independent origin for the complaining witnesses' in-court identification has been clearly and convincingly established so as to assuage any risk of misidentification. (*People v. McTush.*) Accordingly, we conclude there is no basis for reversal on the ground asserted.

V

Defendant next contends that the trial court's failure to exclude Eric Peterson's 18-year-old robbery conviction for impeachment purposes is reversible error. The State maintains that the error is harmless. We agree.

Evidence of a conviction is not admissible for impeachment purposes if a period of more than 10 years has elapsed since the date of conviction

or of the release of the witness from confinement, whichever is the later date. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) However, where the jury's verdict would not have been influenced by the admission of the prior conviction as impeachment evidence, the error is harmless. *People v. Vaughn* (1978), 56 Ill. App. 3d 700, 371 N.E.2d 1248. ■■ Here, the testimony of the witness who was impeached with the conviction contained various inconsistencies and was inconsistent with the testimony of other defense witnesses. Under these circumstances, Peterson's credibility could not have been significantly affected by the admission of the conviction. Defendants have failed to demonstrate how they have been prejudiced by the error, and therefore we conclude the error was harmless.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI, P. J., and JOHNSON, J., concur.