No. 2--06--0384          Filed:  4-11-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--2430 |
| JONATHAN CHATMAN, | ) ) ) | Honorable James C. Hallock, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Jonathan Chatman, appeals his convictions of aggravated domestic battery (720 ILCS 5/12--3.3 (West 2002)) and domestic battery (720 5/12--3.2 (West 2002)) arising out of an altercation with his cousin, Deetra Chatman.  He argues that the trial court's submission of Illinois Pattern Jury Instructions, Criminal, No. 24--25.09 (4th ed. 2000) (hereinafter IPI Criminal 4th), entitled "Initial Aggressor's Use of Force," was erroneous because (1) the evidence did not warrant any instruction on self-defense and (2) the submission of IPI Criminal 4th No. 24--25.09, without additional instructions, assumed that defendant was the initial aggressor even though there had been no prior finding or stipulation on that issue.  We agree with defendant and reverse and remand.

BACKGROUND

Defendant quarreled with Deetra at a family gathering in Aurora on August 14, 2004.  The

quarrel turned violent, and Deetra emerged with a serious cut to her left arm and a broken orbital bone in her face. The State subsequently filed a four-count indictment against defendant. Count I charged defendant with aggravated domestic battery in that he caused "great bodily harm" to Deetra, a family member, by stabbing her. Count II, which charged aggravated battery (720 ILCS 5/12--4(a) (West 2002)), was identical to count I except that it lacked the allegation of familial relation. Count III also charged aggravated battery but alleged that defendant inflicted "bodily harm" on Deetra "by use of a deadly weapon," i.e., a knife (720 ILCS 5/12--4(b)(1) (West 2002)). Count IV charged defendant with domestic battery, alleging that he "hit [Deetra] about the body." Count IV was the only count that did not charge defendant with stabbing Deetra.

The case proceeded to trial. In defendant's opening statement, counsel denied that defendant wounded Deetra with a knife on August 14, 2004. Counsel stated that defendant and Deetra argued heatedly, and, when defendant "tried to leave the house, *** Deetra pushed [him] and provoked him." When defendant tried to reenter the house, Deetra "slammed [a] door" in his face.

The State's first witness was Deetra. She testified that on August 14, 2004, she gathered with family members at her brother Damian Chatman's apartment. Present besides Deetra and Damian were Deetra's boyfriend, Damian's girlfriend, defendant, and several children. Deetra testified that she is defendant's cousin. At about 9:30 p.m., Deetra and her boyfriend were entering the apartment from the porch just as defendant was exiting to the porch. Deetra testified that defendant said to her, "Give that man some air," to which she replied, "Shut up, bitch." Deetra testified that she did not speak the words in a "hostile manner" and that she and defendant would often "play" and "joke around." On this occasion, however, defendant became angry at Deetra's words. He was angered further when Deetra unintentionally struck him with the porch door as she shut it. Deetra testified

that defendant followed her into the apartment and slapped her in the face with his hand. Damian told defendant to leave, and defendant went out to the porch.

Deetra testified that she went to the kitchen and stood at the counter with Damian as he sliced tomatoes with a knife. A short time later, defendant came into the kitchen and told Damian, "I'm cool." Deetra testified that defendant approached her and yelled, "Bitch, don't play with me like that." She yelled back, "You not be hitting on me like those bitches you be hitting on." At this point, defendant was "in [her] face" and had her "pinned against the counter" while he poked her in the right temple with his fingers. Deetra testified that she pushed defendant away and grabbed the knife that Damian had used for cutting tomatoes. Deetra took the knife because she was afraid that defendant "was going to do something else" to her. Deetra did not come toward defendant but stood in place, shaking the knife and saying, "Leave me the hell alone, leave me the hell alone." Defendant approached Deetra but Damian stepped between them, telling defendant, "Leave, 'cuz, just leave." Deetra testified that "scuffling and struggling" ensued as Damian attempted to push defendant away. During the struggle, defendant reached over Damian's shoulder and punched Deetra in the right eye with his closed fist. Deetra fell back against a closed door, which opened against her weight. Deetra testified that she then fell to the floor. She recalled holding the knife as she fell. She blacked out during the fall and woke up on the floor. She saw blood on the floor and a deep cut to her left forearm. Deetra was asked how she might have sustained the cut:

"Q. *** [D]o you recall how you got that cut?

A. I actually don't.

* * *

-3-

Q. *** [W]hen you fell down, is it possible that you accidentally cut yourself?

A. I don't know. I don't think so, but I don't know.

Q. Well, you fell how you said, you fell on your back?

A. Yes.

Q. And where was the knife?

A. In my hands.

Q. In your right hand?

A. Yes.

Q. Where was your left hand, over here [gesturing]?

A. Yes.

Q. Okay. So you didn't cut yourself during the fall, then, correct?

A. No."

Deetra testified that defendant's punch fractured her right orbital bone and that the cut to her arm required multiple stitches.

Damian was the State's next witness. He testified that on the night of August 14, 2004, defendant and Deetra were "calling each other names, back and forth" in a "joking manner." Defendant became upset when Deetra unintentionally closed a door on his heel. Defendant went out to the porch but returned shortly and came into the kitchen, where Damian and Deetra were present. Damian testified that defendant was still angry and told Deetra "to stop playing with him." A "heated argument" arose between them, and the altercation turned "physical" when defendant slapped Deetra. Damian testified that Deetra grabbed a knife from the kitchen counter in an "angered manner" and with the apparent intent to injure defendant. She approached defendant, and Damian stepped

between them. Defendant reached over Damian's shoulder and punched Deetra. Defendant and Deetra then began "tussling," with defendant attempting "to get the knife away from her in a defensive way." During the struggle, the knife dropped from Deetra's hand and cut her arm. In Damian's words, "in the process of [defendant and Deetra] tussling over the knife, she came up stabbed." Defendant never "[got] the knife away from [Deetra]" but the knife just "fell" during their struggle. Damian testified that the cut to Deetra's arm was "accidental." Damian did not see defendant stab Deetra and never saw defendant even take possession of the knife. Damian acknowledged that defendant could have withdrawn from the encounter and left the kitchen immediately after he punched Deetra. He also acknowledged, however, that Deetra began to struggle with defendant immediately after he punched her.

Damian testified that, after Deetra was cut, defendant fled and the police were called. While the police were en route, Damian took the knife and washed it in the kitchen sink because he "didn't want a bloody knife laying around." Damian acknowledged that he and defendant "were raised together" and that he did not want to see defendant "get into any trouble." Damian denied telling the police that Deetra took the knife to defend herself or that defendant wrested the knife from Deetra and stabbed her.

Aurora police officer Matthew Fitchel testified that on the evening of August 14, 2004, he and other officers were dispatched to an apartment in Aurora to investigate a report of a stabbing. Upon arriving at the apartment, Fitchel encountered Damian and inquired about the weapon used in the stabbing. Damian led Fitchel into the kitchen, where Fitchel observed blood on the floor. Damian directed Fitchel to the kitchen sink, where Fitchel saw a knife. Fitchel later spoke to Deetra, who was "crying *** on and off" during their conversation.

Aurora police officer David Tellner testified that he also went to Damian's apartment to investigate the report of a stabbing. Tellner testified that he conversed with Damian, who said that Deetra had picked up the knife to defend herself and that defendant grabbed the knife from her and then stabbed her in the arm.

Defendant presented no witnesses.

At the conference on jury instructions, the State tendered an instruction that tracked IPI Criminal 4th No. 24--25.09, which is entitled "Initial Aggressor's Use of Force." The instruction stated:

"A person who initially provokes the use of force against himself is justified in the use of force only if,

The force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.

Or

In good faith, he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

The assistant State's Attorney explained her rationale for tendering the instruction:

"We argue that though they have not officially raised self-defense, there is the implication of such in the facts of the case ***. There's some innuendos that [Deetra] was the aggressor in this case, even though they have not raised self-defense, clearly that's the innuendo from

the opening statements and I think that from the shakedown of the evidence, that's not the case, but I think this is relevant to the facts that they present to the jury at this time." Defense counsel objected:

"[W]e didn't raise self-defense and I don't think that this Jury Instruction belongs or should be given to the Jury without [sic] having raised the [sic] self-defense. What happened is what happened. The Jury is here to decide the facts and the State is trying to decide the facts ahead of time saying that we're putting on a self-defense argument and we're not."

The court overruled defendant's objection, finding that IPI Criminal 4th No. 24--25.09 "matche[d] up with the testimony." Neither party proposed, nor did the trial court sua sponte submit, any additional instructions on self-defense.

In its initial closing argument, the State departed from the language of counts I and II, which alleged no conduct by defendant other than that he stabbed Deetra. (Count IV was the only count that alleged that defendant struck Deetra.) The State argued that the element of "great bodily harm" in both counts could be met by either the stabbing or the punching, which Deetra claimed broke an orbital bone in her face. In its rebuttal argument, the State clarified that count IV was "the slap and punch Count" and that the remaining counts were premised on the stabbing alone.

In defendant's closing argument, counsel stated:

"On that August 14, 2004, summer night, when [defendant] and Deetra were together, Deetra started calling him a name, 'Bitch.' You heard [Damian] said, 'Well, it didn't really upset [defendant] because they were playing around.' But when he, [defendant], tried to leave, Damian testified Deetra pushed him. It's not accidentally [sic], close the door, hitting his heel, it was pushing and he tried to come back, the door slammed and hit his face. [Deetra]

said--testified that [defendant] was not really playing when she called him a bitch, but she did not apologize, even if [she] accidentally hit his face with the door."

At this point, the State objected to defense counsel's claim that the door hit defendant in the face. The court sustained the objection, and counsel continued:

"[B]oth witnesses who were there could not remember how [Deetra] got cut. And they were both fighting, when they're back and forth struggling with the physical contacts [sic], and [defendant] was struggling with [Deetra] and there was a physical contact. It was not like 'May I have your permission to touch your hands,' and/or physical contact, it was very tense, both were fighting, there was no stabbing done by [defendant], no physical contact, insulting or provoking, knowingly he insulted to [sic] [Deetra]." (Emphasis added.)

The jury returned verdicts of guilty on count I (aggravated domestic battery - great bodily harm), count II (aggravated battery - great bodily harm), and count IV (domestic battery) but acquitted defendant on count III (aggravated battery - deadly weapon). The court denied defendant's motion for a new trial and sentenced him to concurrent prison terms of five years on count I, three years on count II, and three years on count IV. On defendant's motion to reconsider his sentence, the court merged count II into count I and imposed a single five-year term concurrent with the three-year term on count IV. Defendant filed this timely appeal.

ANALYSIS

Defendant argues that: (1) the State did not prove the elements of aggravated domestic battery as charged in count I of the indictment; and (2) the trial court erred by instructing the jury on self-defense at all and by giving deficient instructions on self-defense besides. We address the latter argument first because it is dispositive of this matter.

Defendant argues that the submission of IPI Criminal 4th No. 24--25.09, the "initial aggressor" instruction, was improper both because he did not admit to the acts charged in the indictment and because the instruction was misleading in the absence of additional instructions on self-defense.

The State's first response is that defendant waived both prongs of this argument by failing to make any mention of jury instructions in his motion for a new trial. "Generally, a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a posttrial motion." People v. Piatkowski, 225 Ill. 2d 551, 564 (2007). Supreme Court Rule 451(c), however, provides that "substantial defects [in criminal jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." 210 Ill. 2d R. 451(c). "Rule 451(c) is coextensive with the plain-error clause of Supreme Court Rule 615(a) [(134 Ill. 2d R. 615(a))], and the two [provisions] are construed identically." Piatkowski, 225 Ill. 2d at 564.

"[T]he plain error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565.

Under the plain-error rule, we first determine whether there was any error at all. Piatkowski, 225 Ill. 2d at 565. We agree with defendant that the trial court should not have given any instructions on self-defense and, further, that the instructions the court did give on self-defense were misguided.

IPI Criminal 4th No. 24--25.09, the "initial aggressor" instruction, tracks section 7--4(c) of the Criminal Code of 1961 (Code) (720 ILCS 5/7--4(c) (West 2002)). Section 7--4(c) restricts the default or basic right of self-defense set forth in section 7--1 of the Code (720 ILCS 5/7--1 (West 2002)). Section 7--1 provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7--1 (West 2002).

Section 7--4(c) states:

"The justification described in [section 7--1] is not available to a person who:

* * *

(c) [I]nitially provokes the use of force against himself, unless:

(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(2) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." 720 ILCS 5/7--4(c) (West 2002).

Section 7--4(c), and with it IPI Criminal 4th No. 24--25.09, narrows the circumstances in which a person may use force to defend himself. See People v. Townsend, 136 Ill. App. 3d 385, 391 (1985) ("a person who initiates or provokes the use of force has only a limited right to thereafter use force in self-defense"). IPI Criminal 4th No. 24--25.09 is, as it were, a sub-instruction on self-defense and therefore must meet the preconditions for a self-defense theory at trial.

Self-defense is an affirmative defense (720 ILCS 5/7--14 (West 2002)) and "the raising of such a defense necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted" (People v. Raess, 146 Ill. App. 3d 384, 391 (1986)). Thus, " '[r]aising the issue of self-defense requires as its sine qua non that defendant had admitted [the battery] as the basis for a reasonable belief that the exertion of such force was necessary.' " People v. Diaz, 101 Ill. App. 3d 903, 915 (1981), quoting People v. Lahori, 13 Ill. App. 3d 572, 577 (1973); see also People v. Charleston, 132 Ill. App. 3d 769, 773 (1985) ("Self-defense relates to knowingly and intentionally using force to deter another; for it to be present defendant must have fired the gun intentionally and, where an accident is claimed, self-defense is out of the case"); People v. Kelly, 24 Ill. App. 3d 1018, 1027 (1975) ("Self-defense presupposes the intentional use of force in defense of one's person" and "[t]he test is whether [the] accused honestly believed that he was in such danger, or apparent danger, as required the means taken for his protection"). No instruction on self-defense, IPI Criminal 4th No. 24--25.09 or otherwise, is applicable to an act that a defendant denies committing.

For instance, in Diaz, the defendants were charged with aggravated battery arising out of a quarrel with the victims. At trial, the defendants and the victims disagreed over who initiated the quarrel. The trial court rejected the defendants' tender of a self-defense instruction. The appellate court agreed that self-defense was not an available theory because the "[d]efendants and their

-11-

witnesses consistently asserted that none of the victims had been struck." Diaz, 101 Ill. App. 3d at 914. The first codefendant "testified that after being called a name, he threw a mop at the complainants which did not hit them" and the second codefendant "asserted that he grabbed someone, but he did not testify that he used any force against the complaining witnesses." Diaz, 101 Ill. App. 3d at 915. The court reasoned: "If, as defendants asserted at trial, they never used any force against the victims, then it follows that they could not have reasonably believed force was necessary to protect themselves." Diaz, 101 Ill. App. 3d at 915.

In Lahori, the defendant was accused of homicide for the shooting death of the victim. He challenged the trial court's rejection of his proposed self-defense instruction. He argued that the instruction was appropriate "based on his testimony that although he [did] not remember shooting the deceased, he [did] remember her hitting, scratching, and biting him, and that if he did shoot her, he would have been acting in self-defense." Lahori, 13 Ill. App. 3d at 577. The court held that the defendant's denial that he knowingly killed the victim was "inconsistent with a proper claim of self-defense." Lahori, 13 Ill. App. 3d at 578. See also People v. Tanthorey, 404 Ill. 520, 530 (1949) ("The instructions on self-defense were properly refused; the defendant testified the killing was an accident, that he was not aware he had fired the revolver or that he had shot [the victim], and it was not his intention or purpose to shoot him").

The State maintains that the indispensable premise in all of these cases is that the defendant, not the State, requested the self-defense instruction. The State suggests that "it is only when the defendant himself or herself requests an instruction pertaining to the justified use of force that it is necessary, as a prerequisite, for the defendant to have admitted committing the physical act against the alleged victim." The State cites two cases, Diaz and People v. Jerome, 206 Ill. App. 3d 428

-12-

(1990), neither of which even remotely supports the State's notion. In both Diaz and Jerome, the defense requested the self-defense instruction, and in neither case did the court digress to note what different standard, if any, would control if the instruction were requested by the State.

Our research has disclosed but one published Illinois case, People v. Rice, 234 Ill. App. 3d 12 (1992), where the defendant appealed the submission of a self-defense instruction tendered by the State, over the defendant's objection. The defendant in Rice was charged with aggravated battery. He admitted at trial that he struck the victim, but he claimed he did so " 'reflexively' " when the victim scratched him. Rice, 234 Ill. App. 3d at 27. The defendant also testified that his actions were in " 'self-defense' " because he believed he " 'was being attacked.' " Rice, 234 Ill. App. 3d at 27. The defendant argued on appeal that the instruction on self-defense was improper because it "ran counter to his theory of the case," which was that he lacked the mental state for battery due to the reflexive nature of his actions. Rice, 234 Ill. App. 3d at 26-27. The court upheld the instruction on self-defense, reasoning:

> "[A]lthough the defense objected to the self-defense instruction, the State was entitled to such an instruction based upon defendant's testimony at trial, stating that he acted in 'self-defense' and was 'protecting' himself when he hit [the victim]. Nevertheless, even if the instruction was given in error, the evidence was so overwhelming that defendant did not 'reactively' hit [the victim] that any error was harmless. [The victim] specifically testified that defendant began beating her when she would not have sex with him. Further, [Officer] Watkins testified that defendant told her, ' I don't let no bitch hit me in the face and get away with it'; defendant also told Watkins that he would 'kick her ass' if he weren't handcuffed because 'every woman needs to get their ass kicked.' Likewise, the injuries suffered by [the

victim] are not consistent with a 'reflexive' punch, but rather indicate a severe and violent beating. Accordingly, we find that defendant was not denied a fair trial by the court's instructing the jury on self-defense." (Emphasis added.) Rice, 234 Ill. App. 3d at 27-28. The reasoning in Rice is consistent with Diaz, Lahori, and Tanthorey. The defendant in Rice admitted all elements of the crime. He testified that he struck the victim for a purpose, i.e., to defend himself, and thus admitted that his actions were intentional. Thus, the State has not cited, nor have we found, any Illinois authority that compels us to question that the prerequisites for a self-defense instruction are the same no matter which party requests the instruction.

In our view, the distinction urged by the State rests on an estoppel theory, as it would bar a defendant from brazenly pleading both that he did not commit the act charged and that, if he did, the act was justifiable. The State never is so estopped, the argument goes, because it necessarily asserts all along that the defendant committed the acts charged. We wonder, however, if the State also acts in tension with itself when it brings forth a defense that, if true, would undercut its assertion of culpability. We will not linger in this thicket, however, because the case law does not require it.

With the principles of Diaz, Lahori, and Tanthorey in hand, we determine whether a self-defense instruction was appropriate in this case. The State charged two distinct actions in the indictment. Counts I, II, and III charged defendant with stabbing Deetra. Count IV charged that defendant "hit [Deetra] about the body." On count IV, the State presented evidence at trial that defendant slapped Deetra, pressed his fingers into her temple, and punched her. In closing argument, defense counsel acknowledged that defendant "struggl[ed] with [Deetra] and there was a physical contact." Counsel did not admit to any specific physical act by defendant.

It was error for the trial court to submit a self-defense instruction on acts to which defendant never admitted. Even if the jury were unaware that the formal preconditions for a self-defense instruction in Illinois required it to assume that defendant committed the charged crimes, the jury would be profoundly confused by an instruction addressing the justification of force that defendant flatly denied using.

Our approach finds foreign support in Smith v. State, 698 So. 2d 632 (Fla. App. 1997), where the defendant was charged with "burglary with a battery" and the trial court instructed the jury on self-defense at the State's request and over the objection of the defendant. The appellate court held that it was error to give the instruction:

"Self-defense *** results in a tacit admission that the defendant committed the crime at issue. In this case, the State employed the self-defense instruction to argue to the jury in closing that [the defendant] did not act in self-defense when he battered the victim. Thus, the State was allowed to argue that [the defendant] should not be excused of his criminal conduct. While, at the same time, [the defendant], throughout the trial, contended he was not the intruder in the victim's apartment and this was a case of misidentification. The instruction was completely inconsistent with [the defendant's] defense in this case and we cannot say it was harmless error." Smith, 698 So. 2d at 633.

As in Smith, the defense here admitted none of the elements of the crime charged, rendering self-defense unavailable.

Even if, as we firmly deny, a self-defense instruction were appropriate here, we would still find error. The jury was given an impossibly truncated understanding of self-defense in that IPI Criminal 4th No. 24--25.09 was not accompanied by IPI Criminal 4th No. 24--25.06. IPI Criminal

4th No. 24--25.09 is subject to a predicate fact, that defendant was the initial aggressor. IPI Criminal 4th No. 24--25.09 includes no alternative standard of self-defense to be applied if the predicate is absent; rather, the predicate is stated as a given. Where IPI Criminal 4th No. 24--25.09 is submitted without IPI Criminal 4th No. 24--25.06 (the default or basic standard of self-defense), the jury is compelled to assume that the defendant was the initial aggressor and therefore had a diminished right of self-defense.

Such is the message of People v. Day, 2 Ill. App. 3d 811 (1972), where the defendant challenged the trial court's submission of IPI Criminal 4th No. 24--25.09 over his objection. The defendant argued that the instruction "erroneously assumed as a fact that [he] had initially provoked the encounter although there was conflicting evidence." Day, 2 Ill. App. 3d at 813. The court acknowledged that there was conflicting evidence on whether the defendant was the initial aggressor but concluded that, because IPI Criminal 4th No. 24--25.09 was submitted together with IPI Criminal 4th No. 24--25.06, the jury could "resolve the issues on either hypothesis." Day, 2 Ill. App. 3d at 813; see also People v. Fleming, 155 Ill. App. 3d 29, 37 (1987) ("Where there is conflicting evidence regarding the issue of self-defense, the jury should be given both the self-defense and initial aggressor instruction so that they might decide between the conflicting evidence and apply the correct law").

Unlike in Day, the jury here was given not two hypotheses of self-defense to weigh according to the evidence but, rather, the fixed premise that defendant was the initial aggressor. As the question of whether defendant was the initial aggressor had not been resolved, it was error for that issue not to go to the jury. See People v. Edmondson, 328 Ill. App. 3d 661, 665 (2002) ("Identifying the initial aggressor is a question of fact for the jury to resolve"). It was equally wrong for the trial court, having instructed the jury on self-defense (albeit incompletely), not to also instruct it that the State had the

-16-

burden of disproving the defense beyond a reasonable doubt.  See People v. Lee, 213 Ill. 2d 218, 224 (2004) ("Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving elements of the charged offense").

Our plain-error analysis has, then, uncovered several errors by the trial court.  Because the defendant denied committing the acts charged, the trial court erred by instructing the jury on self-defense at all and by submitting incomplete instructions on self-defense besides.  These instructions assumed not only that defendant committed the acts charged but that he did so with the restricted right of self-defense possessed by an initial aggressor, even though that particular issue had never been resolved.  The instructions also said nothing of the State's burden of proving beyond a reasonable doubt that defendant did not act in self-defense.  "The defendant enjoys the benefit of the presumption of innocence until the point during deliberation when the jury concludes that there existed proof beyond a reasonable doubt."  People v. Brooks, 345 Ill. App. 3d 945, 951 (2004).  The trial court's instructions foisted on the jury vital assumptions regarding defendant's guilt and eviscerated his presumption of innocence.  These are serious affronts to the "fundamental doctrine of our system of criminal justice jurisprudence that the law presumes the innocence of an accused until he is proved guilty beyond a reasonable doubt" (People v. Weinstein, 35 Ill. 2d 467, 469-70 (1966)).  Our system of justice cannot countenance the trial court's errors no matter their actual impact on the outcome of the trial.  The errors were "so serious that [they] affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence" (Piatkowski, 225 Ill. 2d at 565).  Thus, "[p]rejudice to *** defendant is presumed" (People v. Herron, 215 Ill. 2d 167, 187 (2005)), and we therefore reverse and remand for a new trial.

The court in Rice, we recognize, applied a harmless-error analysis to the instruction on self-defense. Finding the instruction proper because the defendant himself characterized his actions as defensive, the court noted alternatively that there was no prejudice from the jury's likely assumption that the defendant committed the crime, for the evidence of the crime was overwhelming. The defendant in Rice, however, essentially admitted the crime in his testimony. Here, defendant did not testify and the defense denied all elements of the crimes charged. The error in the present case was correspondingly greater than that in Rice. Smith, the more analogous case, also applied a harmless error analysis, but of course we owe no deference to the Florida appellate court.

Although we have found plain error independently of the outcome at trial, we pause to note that defendant's acquittal on count III (aggravated battery - use of a deadly weapon) does not necessarily entail that the jury was not influenced by the misconceived instruction on self-defense. The jury could have assumed that defendant committed aggravated battery by stabbing Deetra and yet found that the act was justified (even under the greater burden established by IPI Criminal 4th No. 25--24.09). To explain this possibility, we note that counts I (aggravated domestic battery - great bodily harm), II (aggravated battery - great bodily harm), and III (aggravated battery - use of a deadly weapon) charged that defendant stabbed Deetra, while count IV charged that defendant "hit her about the body." The State contended in its initial closing argument, however, that the element of "great bodily harm" in counts I and II was satisfied not just by the stab but also by the punch, which Deetra testified broke her orbital bone. Indeed, the verdict of acquittal on count III and the verdicts of guilty on counts I, II, and IV are reconcilable only on the supposition that the jury found that defendant struck Deetra, while also finding one (or more) of the following: (1) defendant did not stab Deetra; (2) her wound did not constitute "bodily harm"; (3) he stabbed her justifiably; or (4) a knife is not a

"deadly weapon," regardless of whether he stabbed her. Thus, the jury may well have assumed, based on the self-defense instruction, that defendant stabbed Deetra, yet acquitted him on other grounds. If the jury assumed that defendant stabbed Deetra, it may well have assumed that he struck her as well and thus was guilty on counts I, II, and IV.

We briefly discuss the State's alternative argument for finding that defendant's contentions are procedurally defaulted. The State invokes the doctrine of invited error, which provides: "where the trial court's course of action is taken at defendant's suggestion and the defendant thereafter acquiesces in the court's expressed course of conduct, the defendant should be precluded from raising such course of conduct as error on appeal." People v. Abston, 263 Ill. App. 3d 665, 671 (1994). The State argues that, because defendant expressly rejected a self-defense theory below, he cannot now argue any deficiency in the self-defense instructions given to the jury. Of course, this argument has no bearing on the trial court's initial decision to instruct the jury on self-defense, which defendant expressly contested and which we have found to be plain error. The argument has no force even with respect to defendant's claim that the trial court erred by submitting IPI Criminal 4th No. 24--25.09 without additional instructions. The State's premises are faulty. The course of action to which defendant assigns error was not taken "at [his] suggestion," for the State was the party who pressed for a self-defense instruction. To be frank, we also find the State's argument somewhat disingenuous. By the State's logic, if defendant had proposed additional instructions on self-defense, against his belief that the doctrine was not at all applicable, the State would doubtless claim that he had acquiesced in the submission of a self-defense theory in the first instance. We see no way in which defendant might have invited error here.

Finally, we determine whether principles of double jeopardy protect defendant from a new trial. Defendant's acquittal on count III is an absolute bar to retrial on that count. See People v. Milka, 336 Ill. App. 3d 206, 224 (2003) ("Once a defendant has been acquitted of an offense, double jeopardy prohibits a second prosecution for that offense"). As for the remaining counts, " '[d]ouble jeopardy does not preclude retrial of a defendant whose conviction is supported by sufficient evidence but set aside because of errors in process' [citation]" (People v. Gargani, 371 Ill. App. 3d 729, 736 (2007)). "When considering the sufficiency of the evidence, a reviewing court does not retry the defendant." Gargani, 371 Ill. App. 3d at 736. "Rather, *** the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." People v. Smith, 185 Ill. 2d 532, 541 (1999).

We begin with count IV, on which the evidence was undisputed. Count IV charged domestic battery (720 ILCS 5/12--3.2(a)(2) (West 2002)) and alleged that defendant "knowingly made contact of an insulting or provoking nature with [Deetra] *** in that [he] hit her about the body." Damian and Deetra, the only two occurrence witnesses at trial, testified that defendant slapped and punched Deetra. Defendant offered no evidence to challenge this testimony. The conviction on count IV was, we conclude, supported by sufficient evidence.

The evidence also supports the convictions on counts I and II, but the question is somewhat closer. Counts I and II both charged aggravated battery and alleged that defendant stabbed Deetra. Damian and Deetra both testified that Deetra was stabbed with the knife near the end of her struggle with defendant in the kitchen. Deetra testified that defendant punched her and she fell back, and her last memory was of falling while holding the knife in her right hand. She awoke on the floor and saw

that her left arm had been cut. Deetra initially testified that she did not know whether she accidentally cut herself "[w]hen [she] fell down." When, however, she was asked about the position of her hands during the fall and asked again whether she "cut [her]self during the fall," Deetra replied, "No."

Damian gave a significantly different version of events. Where Deetra testified that she still had the knife as she began to fall, Damian testified that the knife fell from Deetra's grasp during her struggle with defendant, apparently while she was still upright. Damian claimed that the cut to Deetra's arm was accidental. Damian testified that he never saw defendant take possession of the knife and that he never told the police that defendant stabbed Deetra. Damian did, however, admit that he took the knife from the floor and cleaned it before the police arrived. He explained that he "didn't want a bloody knife laying around." Tellner testified that he was told by Damian that defendant "got the knife [from Deetra] and then stabbed her."

The State's evidence that defendant stabbed Deetra was largely circumstantial, but "[a] defendant can be convicted solely on circumstantial evidence" (People v. Saxon, 374 Ill. App. 3d 409, 417 (2007)). "When the evidence is circumstantial, the jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. The evidence is sufficient if all of it, taken together, satisfies the jury that the defendant is guilty beyond a reasonable doubt." Milka, 336 Ill. App. 3d at 229. "[T]he reviewing court must allow all reasonable inferences from the record in favor of the prosecution" (People v. Cunningham, 212 Ill. 2d 274, 280 (2004)), and "the question is not whether a rational jury could have acquitted defendant" but "whether a rational jury could have convicted him" (Milka, 336 Ill. App. 3d at 230).

Deetra testified that she blacked out during the struggle and did not remember being cut. Only Damian claimed to have witnessed Deetra being cut, and he denied that defendant intentionally cut

her. A rational jury could well have found Damian discredited by Tellner's impeaching testimony and by his own improbable claim that, with police en route, he would disturb a potential crime scene purely for cleanliness. A rational jury could also have found that stabbing Deetra was consistent with defendant's apparently unrelenting hostility toward her that night. Finally, defendant's flight from the scene was "a circumstance from which a trier of fact may infer consciousness of guilt." People v. McDonald, 168 Ill. 2d 420, 448 (1995). We find the convictions on counts I and II supported by sufficient evidence.

There is, we conclude, no double jeopardy bar to a new trial on counts I, II, and IV. In so concluding, we make no finding of guilt that is binding on retrial. See Gargani, 371 Ill. App. 3d at 737.

For the foregoing reasons, we reverse the judgment of the circuit court of Kane County and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

BYRNE, P.J., and ZENOFF, J., concur.