2023 IL App (4th) 220381

NO. 4-22-0381

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 21, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DWAYNE K. TAYLOR, | ) | No. 18CF491 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rudolph Braud, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court, with opinion.
Justices Steigmann and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Dwayne K. Taylor, appeals from his convictions for being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2018)) and aggravated battery with a firearm (*id.* § 12-3.05(e)(1)). Specifically, defendant argues he is entitled to a new trial because the trial court erroneously denied defendant's requests for jury instructions on self-defense and necessity despite the presence of evidence in the record supporting those defenses. Defendant further asserts he is entitled to a new sentencing hearing because the court used the same prior Class X felony conviction as both an element of the AHC offense and to qualify defendant for a life sentence under the habitual offender statute (730 ILCS 5/5-4.5-95(a) (West 2018)), resulting in an improper double enhancement. We affirm defendant's convictions and sentence.

¶ 2                                I. BACKGROUND

¶ 3                              A. Charges and Pretrial Proceedings

¶ 4          In May 2018, the State charged defendant by information with (1) AHC (720 ILCS 5/24-1.7(a) (West 2018)), in that he knowingly possessed a firearm after having been convicted of armed robbery in Cook County case No. 05-CR-1722301 and unlawful possession of a weapon by felon in Sangamon County case No. 09-CF-942 (count I); (2) aggravated battery with a firearm (*id.* § 12-3.05(e)), in that he knowingly and by means of discharging a firearm caused injury to Artemus Hunter, in that defendant shot Hunter in the left arm with a pistol (count II); and (3) unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) (count III). Several weeks later, the charges were superseded by indictment.

¶ 5          Prior to trial, defendant filed a motion to suppress statements based on alleged inadequate *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), which the trial court denied. Additionally, defendant filed notices of affirmative defenses, which disclosed his intention to assert the affirmative defenses of self-defense and necessity.

¶ 6                                      B. Jury Trial

¶ 7          The trial court conducted defendant's jury trial in November 2021. A summary of the evidence presented at trial follows.

¶ 8                                  1. *State's Case-in-Chief*

¶ 9                                      a. Tad Stalets

¶ 10          Tad Stalets testified he was employed as a patrol officer for the Springfield Police Department in May 2018. In the early morning hours of May 1, 2018, Officer Stalets responded to a call regarding a shooting. Officer Stalets proceeded to AAA Automotive in Springfield to meet the alleged victim, Artemus Hunter. Officer Stalets observed Hunter had an injury to his arm,

which appeared to be a gunshot wound. Based on information Hunter provided, Officer Stalets learned the shooting took place at an apartment building located at 2070 Bradley Court.

¶ 11 After arriving at the crime scene, Officer Stalets was tasked with conducting a "showup" with a witness named Daniel Roberts. Officer Stalets explained a showup is a method used by law enforcement wherein a witness to a crime is taken to a location where a potential suspect is being detained and is provided the opportunity to identify the suspect. Roberts informed the police he witnessed the alleged suspect drive away from the Bradley Court apartment building in a gold Chevrolet Malibu with a female passenger. Another witness later saw the suspect get into a different vehicle, which law enforcement located and stopped near the intersection of 14th and Stuart Streets. Officer Stalets brought Roberts to that intersection for the showup, and Roberts positively identified defendant. Officer Stalets also brought Roberts to the intersection of Eighth Street and South Grand Avenue for another showup, where he positively identified defendant's female passenger.

¶ 12 b. Daniel Roberts

¶ 13 Roberts testified he lived in an apartment building on Bradley Court on May 1, 2018. Around 7:45 a.m. that day, Roberts was getting ready for work when he noticed several police cars outside the building. Prior to their arrival, Roberts observed a tan Malibu leaving the parking lot. Roberts knew the occupants of the vehicle to be a man named Dwayne Taylor and a woman named Whitney but testified he did not see the man he identified as Taylor in the courtroom. Roberts knew Whitney from living in the apartment building. On cross-examination, Roberts agreed he did not hear a gunshot that morning and did not see the shooting.

¶ 14 c. Detective Charles Redpath

¶ 15        Charles Redpath testified he was currently a detective with the Springfield Police Department. On May 1, 2018, Detective Redpath was driving to work when he heard over his radio a shooting had taken place on Bradley Court. Detective Redpath learned the suspect was described as a Black man with glasses who was accompanied by a woman, and the pair had been seen leaving Bradley Court in a gold Chevrolet. As Detective Redpath approached the intersection of Ninth Street and South Grand Avenue, he observed a gold Chevrolet proceeding northbound on Ninth Street. The driver and passenger matched the description of the suspects he had been provided over the radio. Detective Redpath followed the vehicle to a laundromat, where he observed the male driver exit the vehicle and get into the passenger's side of a Buick. After the Buick exited the parking lot, Detective Redpath requested backup, and officers effectuated a traffic stop of the Buick just north of Feitshans Elementary School. Detective Redpath identified defendant as the passenger of the Buick.

¶ 16                                d. Steven Cody

¶ 17        Steven Cody testified he lived in an apartment diagonally across from apartment E on May 1, 2018, where the shooting in this case occurred. Cody knew Denise Taylor and defendant resided in apartment E. Around 7:45 a.m., Cody heard a gunshot while in his living room. Cody did not see the gun or who fired it and did not hear any arguments or commotion prior to the shooting. Cody asked his wife to call the police, and when he looked out his window, he observed a tan car leaving the parking lot.

¶ 18                                e. Timothy Price

¶ 19        Timothy Price testified he was employed as the head custodian for Springfield School District No. 186. On May 1, 2018, Price was working outside on the grounds of Feitshans Elementary School. While weed eating that morning, Price found a firearm in a holster near a sign

around 14th Street, "right off of Stuart Street block," which he explained was "the south side \*\*\* lot across the street from the school." The State introduced People's exhibit Nos. D1, D2, and D3, which Price identified as photos of the Feitshans building, the sign where he found the firearm, and the firearm itself, respectively. The exhibits were admitted with no objection. In exhibit D2, a dark Buick is parked near the sign with a police car parked behind it. Price agreed he found the firearm "fairly close" to where the dark Buick had been parked. Price reported the firearm to security and the police.

¶ 20                                    f. Michael Powell

¶ 21            Michael Powell testified he was employed as a sheriff's deputy with the Sangamon County Sheriff's Office. On May 1, 2018, Deputy Powell was on patrol with Deputy Craig Law. Over the radio, they were informed a shooting had taken place and two suspect vehicles were observed at a laundromat on Ninth Street and South Grand Avenue. They proceeded to the laundromat, where they observed the darker vehicle leaving the parking lot. They pursued the vehicle and effectuated a traffic stop to investigate the vehicle's possible involvement with the shooting. The passenger side of the vehicle, which Deputy Powell testified was a Buick, was positioned along the curb. Deputy Powell identified defendant as the passenger. After asking the occupants to exit the vehicle, Deputy Powell handcuffed defendant and performed a pat-down in the grassy area between the curb and the sidewalk while officers from the Springfield Police Department searched the Buick for weapons. Officers did not recover any weapons during the pat-down or vehicle search.

¶ 22                        g. Dr. Nate Blaustein Stipulated Testimony

¶ 23            A written stipulation was then read into the record by the assistant state's attorney, which provided that Dr. Nate Blaustein was a physician in the department of emergency medicine

at HSHS St. John's Hospital in Springfield. On May 1, 2018, Blaustein oversaw an examination of Hunter by then-resident Dr. Mark Baker. Drs. Blaustein and Baker determined Hunter had suffered a gunshot wound. They noted an entry point to his upper left bicep that was caused by a projectile but observed no exit wound.

¶ 24                                    h. Forensic Witnesses

¶ 25          Kim Overby testified she was a crime scene detective for the Springfield Police Department. On the morning of May 1, 2018, Detective Overby was called to investigate a shooting. Detective Overby first went to HSHS St. John's to meet with Hunter, where she photographed Hunter and his injuries. She also collected evidence from Hunter's car, which was parked near the Bradley Court apartments, and the tan Malibu, which Detective Overby learned belonged to Whitney Haynes. Detective Overby was then called to Feitshans Elementary School, where she collected the revolver and holster Price discovered. Upon processing the revolver, Detective Overby was able to determine, from her training and experience, it had been fired.

¶ 26          John Carnes, a forensic scientist from the Illinois State Police crime laboratory (ISP Crime Lab), was accepted at trial as an expert in fingerprint analysis. He received an exhibit with six latent print lifts taken from Hunter's car door and an exhibit containing a revolver, cartridges, a spent cartridge case, and a holster. He could not locate latent prints on the cartridge case or the holster, but he matched latent fingerprints from Hunter's car door to defendant.

¶ 27          Cory Formea, a forensic scientist from the ISP Crime Lab, was accepted at trial as an expert in deoxyribonucleic acid (DNA) analysis and interpretation. He analyzed samples collected from the revolver and holster in this case. The revolver contained DNA that was a mixture of at least three people, but his analysis was inconclusive. The holster contained a mixture

of two individual profiles: a major contributor and a minor contributor. Upon comparison, defendant could not be excluded as a possible contributor to the major profile.

¶ 28                                             i. Michael Flynn

¶ 29        Detective Michael Flynn testified that on May 1, 2018, he responded to HSHS St. John's Hospital with Detective Jeremy Oldham, where they interviewed Hunter. They also interviewed defendant at the Springfield Police Department. Through Detective Flynn, the State presented certified copies of defendant's prior convictions for armed robbery in Cook County case No. 05-CR-1722301 and for unlawful use of a weapon by a felon in Sangamon County case No. 09-CF-942.

¶ 30        People's exhibit R, which Detective Flynn testified was a true and accurate copy of the recorded interview he had with defendant, was published to the jury. In the interview, defendant explained Hunter came to his door asking for Whitney and for his money. Defendant claimed Hunter swung at him, so he shot Hunter in the arm. However, defendant did not admit he possessed the revolver before Hunter came to the door.

¶ 31                                             j. Paul Baker

¶ 32        Springfield police officer Paul Derrick Baker testified that on May 1, 2018, he responded to 14th and Stuart Streets, where sheriff's deputies had stopped the Buick occupied by Lee and defendant. After defendant's interview with Detective Flynn, Officer Baker transported defendant to the Sangamon County jail. While waiting in the booking area, defendant discussed the shooting, and his statements were captured on Officer Baker's body-worn camera. The footage from the body-worn camera was published to the jury as People's exhibit S. In the footage, defendant explained how he successfully disposed of the revolver after being stopped by law enforcement without officers noticing. Additionally, he explained the size of the revolver "fools"

everyone because it looks like it holds only two shots, when it actually holds five. Defendant stated, "[Hunter] tried to steel me," but "I got a shorty here behind my pocket." As he said this, he gestured toward his back pocket and demonstrated how he took the revolver out and shot Hunter from his hip.

¶ 33                                    2. *Defendant's Case-in-Chief*

¶ 34          Defendant moved for a directed verdict, which the trial court denied. The court admonished defendant of his right to testify, and defendant informed the court that he wished to testify.

¶ 35          Defendant testified on his own behalf. On May 1, 2018, defendant lived at 2070 Bradley Court, apartment E, with his mother, Denise Taylor, and girlfriend, Whitney Haynes. On the morning of May 1, 2018, defendant and Whitney were at home when the doorbell rang. Whitney was sleeping, and defendant was not expecting anyone. Through the window, he recognized a car from an incident that occurred a few weeks prior. During the incident, defendant and Whitney were in Whitney's car when Hunter pulled up to them in said vehicle. At the time, defendant only knew Hunter by his street name of "East Saint." Hunter had asked Whitney for money she owed him, and they had an exchange.

¶ 36          Defendant saw Hunter through the peephole of his apartment door, and when he opened it, Hunter said, " 'I'm here to see Whitney to collect my money.' " Defendant told him Whitney was not home, and Hunter repeated that he needed to collect his money. Defendant testified Hunter "trie[d] to steel" him. Defendant elaborated, "[Hunter] ma[de] an upward motion, so I grabbed his hand, then a pop goes off, pop, and he drops his gun and runs down the street." Defendant initially claimed Hunter had his hand in his pocket. When he took it out, defendant saw

a gun holster fall out, and he grabbed Hunter's hand. Defendant heard a "pop," and Hunter dropped the gun and ran. Defendant picked up the gun and holster.

¶ 37 After Hunter ran away, his car was still there with the engine on. Defendant drove Hunter's car to the Mary Bryant parking lot about a football field away because he wanted to get the car away from his home. Defendant testified he wanted to "get everything away" so no one could tie him to the shooting. Defendant also feared unnamed friends of Hunter might come looking for him in retaliation. After he returned home, defendant and Whitney left in her car. He called Ivan Lee, who picked him up from the laundromat. After they were pulled over and arrested, defendant managed to toss the revolver and holster into the grass without being noticed. Defendant maintained the revolver was not his and he obtained it from Hunter.

¶ 38 On cross-examination, defendant admitted he did not tell Detectives Flynn or Oldham this story when they interviewed him. Defendant asserted the story he told Officer Baker was not the truth and conceded it was different from his trial testimony. Furthermore, defendant denied intentionally shooting Hunter or seeing the revolver until the date of the shooting. Additionally, defendant claimed that, when he told Officer Baker that he had a "shorty" in his pocket, he meant his girlfriend Whitney. Defendant also denied talking to Hunter about whether Hunter would testify.

¶ 39                                     3. *Rebuttal*

¶ 40 In rebuttal, the State moved to admit defendant's recorded telephone conversations from the county jail, which the trial court allowed to be published to the jury. In the calls, defendant can be heard in different clips informing his mother and girlfriend, respectively, that he spoke with Hunter, who assured him he would not testify at trial. Defendant also states someone named

"Terrence" advised defendant that he needed to make it look like he and Hunter had a "tussle" and that the revolve belonged to Hunter.

¶ 41                    C. Jury Instructions, Verdict, and Posttrial Motions

¶ 42          During the instructions conference, defendant requested instructions on the affirmative defenses of self-defense and necessity. After argument by both parties, the trial court denied both instructions.

¶ 43          In closing arguments, the State emphasized defendant's inculpatory statements to the police. Defendant's counsel declined to give a closing statement. He explained his decision was based on the trial court's denial of his requests for instructions on self-defense and necessity. Following deliberations, the jury found defendant guilty of all three charges.

¶ 44          Defendant filed initial and amended motions for a new trial, arguing, *inter alia*, the trial court erroneously denied his requests for instructions on the affirmative defenses of necessity and self-defense. The court denied the amended motion.

¶ 45                    D. Sentencing

¶ 46          In May 2022, defendant's case proceeded to a sentencing hearing.

¶ 47          The State asserted defendant was a habitual offender and was therefore subject to mandatory natural life sentences under section 5-4.5-95(a) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-95(a) (West 2018)). In support of its argument, the State presented certified copies of defendant's convictions for (1) armed robbery in Cook County case No. 05-CR-1722301 and (2) unlawful possession of a weapon by a felon in Sangamon County case No. 09-CF-942.

¶ 48          Defendant's counsel conceded that defendant was eligible for Class X sentencing but argued a natural life sentence would be excessive under the United States and Illinois

Constitutions. Defendant's counsel further asserted that the trial court's consideration of the 2005 armed robbery conviction as both (1) a predicate felony for defendant's AHC conviction and (2) a basis to sentence him as a habitual offender would result in an improper double enhancement.

¶ 49    The trial court found defendant's unlawful possession of a weapon by a felon conviction merged with the AHC conviction and adjudicated him a habitual offender under section 5-4.5-95(a) of the Unified Code. Accordingly, the court sentenced defendant to natural life sentences on both the AHC and aggravated battery with a firearm charges.

¶ 50    Defendant filed a motion to reduce his sentences, arguing they were excessive. The trial court denied the motion.

¶ 51    This appeal followed.

¶ 52                            II. ANALYSIS

¶ 53    On appeal, defendant argues the trial court erroneously denied his requests for jury instructions on the affirmative defenses of self-defense and necessity because he presented some evidence to support each instruction and he is entitled to a new trial. The State argues the court's denial of defendant's requests for self-defense and necessity instructions was correct and that he is therefore not entitled to a new trial. Defendant also asserts he is entitled to a new sentencing hearing because the court's consideration of his 2005 armed robbery conviction as both a predicate offense for his AHC conviction and to adjudicate him a habitual offender resulted in an improper double enhancement. The State argues no improper double enhancement occurred and the court did not abuse its discretion when it sentenced him to natural life in prison. We affirm.

¶ 54                          A. Jury Instructions

¶ 55        Defendant first argues there was some evidence to support jury instructions on the affirmative defenses of self-defense and necessity and the trial court therefore abused its discretion by denying defendant's request to submit them to the jury. We disagree.

¶ 56        A defendant's due process and jury trial rights include the right to have a jury fully and properly instructed on the law, including the law applicable to the defendant's theory of the case. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 2, 8; *People v. Jones*, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997). "A defendant is entitled to an instruction on his theory of the case if there is *some* foundation for the instruction in the evidence." (Emphasis added.) *Jones*, 175 Ill. 2d at 131-32. Even "[v]ery slight evidence upon a given theory of a case will justify the giving of an instruction." *Id.* at 132.

¶ 57        In *People v. McDonald*, 2016 IL 118882, ¶ 42, 77 N.E.3d 26, the Illinois Supreme Court held, when a trial court has determined there is insufficient evidence to support giving a certain jury instruction, that decision is reviewed for an abuse of discretion. "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court." *People v. Melecio*, 2017 IL App (1st) 141434, ¶ 41, 89 N.E.3d 874.

¶ 58                                    1. *Self-Defense*

¶ 59        To be entitled to an instruction on self-defense, the defendant must present some evidence supporting each of the following elements:

"(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required

the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries*, 164 Ill. 2d 104, 127-28, 646 N.E.2d 587, 598 (1995).

Additionally, the defendant must necessarily admit to the crime for which he is being prosecuted. *People v. Chatman*, 381 Ill. App. 3d 890, 897, 886 N.E.2d 1265, 1272 (2008). Stated differently, if the defendant denies using force against the victim, he cannot have reasonably believed force was necessary for protection—and therefore cannot argue self-defense. See *id.* at 897-98; see also *People v. Diaz*, 101 Ill. App. 3d 903, 914-15, 428 N.E.2d 953, 962-63 (1981); *People v. Salas*, 2011 IL App (1st) 091880, ¶ 84, 961 N.E.2d 831. Under section 12-3.05(e)(1) of the Criminal Code of 2012, a person commits aggravated battery with a firearm when, in committing a battery, he knowingly "[d]ischarges a firearm, other than a machine gun or a firearm equipped with a silencer, and causes any injury to another person." 720 ILCS 5/12-3.05(e)(1) (West 2018).

¶ 60        Here, the trial court properly rejected defendant's request for a self-defense instruction. First, under the set of facts defendant presented at trial, defendant never admitted to knowingly discharging the firearm that caused injury to Hunter. Instead, in his testimony, defendant claimed he merely grabbed Hunter's hand and the gun discharged. Defendant denied possessing the revolver until after Hunter left the apartment building. Accordingly, this testimony, if believed by the jury, would have supported a finding defendant was not guilty because he did not shoot Hunter at all—not that he shot Hunter in self-defense because it was necessary for defendant's protection.

¶ 61        Under the set of facts the State presented at trial, if believed by the jury, defendant shot Hunter after Hunter swung at him with his fist. In his statements to Officer Baker from the body-worn camera footage, defendant admitted he had a "shorty" in his back pocket and gestured shooting from the hip—implying he did, in fact, possess the revolver prior to Hunter's arrival.

Later, and immediately after claiming his statements to police were lies, defendant testified a "shorty" meant his girlfriend. Yet, on appeal, in response to the State's claims regarding the trial evidence, defendant asserts his belief he needed to shoot Hunter would have been objectively reasonable because Hunter came at him with his revolver in his hand. In the interview where defendant admitted to shooting Hunter, he also contends he never admitted to possessing the revolver prior to Hunter's arrival—the very interview in which he has claimed he lied to the police. Under the scenario presented by the State, there was no objectively reasonable basis for defendant to believe he was required to use the level of force he exerted—*i.e.*, shooting Hunter with the revolver—to defend against the threat of Hunter's punch. See, *e.g.*, *People v. Moore*, 343 Ill. App. 3d 331, 341, 797 N.E.2d 217, 226 (2003) (holding the trial court properly denied self-defense instruction where there was no evidence that the defendant acted under objectively reasonable belief that the threat presented by victim, with whom defendant had picked a fight, required the use of a handgun).

¶ 62        Because neither set of facts, if believed by the jury, would have supported an instruction on self-defense, the trial court's denial of a self-defense instruction was not arbitrary, fanciful, or unreasonable. Consequently, we conclude that the trial court did not abuse its discretion in denying the instruction on self-defense.

¶ 63                                  2. *Necessity*

¶ 64        Next, defendant argues the trial court abused its discretion in denying his request for a jury instruction on the affirmative defense of necessity with respect to his convictions for AHC and unlawful possession of a weapon by a felon because he presented some evidence to support the instruction. We disagree.

¶ 65        Section 7-13 of the Criminal Code of 2012 defines the defense of necessity as follows:

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2018).

Accordingly, to be entitled to such an instruction, the defendant is required to show some evidence of each of the following elements: the defendant (1) "was without blame in occasioning or developing the situation" and (2) "reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." *Id.*; *People v. Janik*, 127 Ill. 2d 390, 399, 537 N.E.2d 756, 760 (1989). "This defense is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *Janik*, 127 Ill. 2d at 399. In other words, "[t]he defense of necessity applies when the threat of harm was immediate and defendant's conduct was the sole option to avoid injury." *People v. Guja*, 2016 IL App (1st) 140046, ¶ 47, 51 N.E.3d 970. Additionally, the threat of harm must be "specific and immediate." *People v. Kite*, 153 Ill. 2d 40, 45, 605 N.E.2d 563, 566 (1992). As stated above, this court reviews the trial court's determination that there is insufficient evidence to support giving a certain jury instruction for an abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 42.

¶ 66        Defendant contends he presented slight evidence that his possession of the revolver should be excused by the affirmative defense of necessity because he testified he feared retaliation

from Hunter's friends, who could have returned to the scene at any moment. Even assuming defendant's fear was genuine, defendant did not specifically identify who these friends were or why he believed they were an immediate threat. Neither the State nor defendant presented any evidence implying Hunter had friends or associates willing to retaliate against defendant for the shooting. The mere possibility that Hunter *could* have had friends who *may* have wanted to retaliate is not evidence of a specific or immediate threat. Furthermore, defendant's conduct of collecting the revolver from the apartment and carrying it with him into three different vehicles before clandestinely disposing of it near an elementary school while under arrest was not his "sole option" to avoid the potential injury of retaliation from Hunter's unnamed associates. Even if we accepted defendant's assertion he had no opportunity to safely dispose of the weapon prior to his arrest due to the short time frame in which the events in this case occurred, the act of secretly tossing the weapon into the grass by the elementary school arguably created a greater public safety threat. Accordingly, the trial court did not abuse its discretion in denying defendant's request for a necessity instruction.

¶ 67                                  B. Sentencing

¶ 68         Finally, defendant argues he is entitled to a new sentencing hearing because the trial court considered the same prior Class X felony conviction as both an element of the AHC offense and to sentence defendant to natural life in prison under the habitual offender statute (730 ILCS 5/5-4.5-95(a) (West 2018)), resulting in an improper double enhancement. The State argues no improper double enhancement occurred.

¶ 69         Generally, in sentencing a criminal defendant, "a single factor cannot be used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed." (Internal quotation marks omitted.) *People v. Phelps*, 211 Ill. 2d 1, 11-12,

809 N.E.2d 1214, 1220 (2004). This practice, known as "double enhancement," has been discussed by the Illinois Supreme Court as follows:

> "The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense. [Citation.] The double-enhancement rule is one of statutory construction [citation], and the standard of review therefore is *de novo* [citation]." *Id.* at 12.

"However, an exception to the prohibition against double enhancement occurs where the legislature clearly intends to enhance the penalty based upon some aspect of the crime and that intention is clearly expressed." *People v. Powell*, 2012 IL App (1st) 102363, ¶ 8, 970 N.E.2d 539.

¶ 70 This court considered an argument identical to defendant's in *People v. O'Neal*, 2021 IL App (4th) 170682, 196 N.E.3d 95. In that case, the parties stipulated to the defendant's two prior Class X felony convictions for armed robbery and intent to deliver a controlled substance. *Id.* ¶ 77. After a trial, the jury found the defendant guilty of AHC and unlawful possession of a weapon by a felon. *Id.* The State filed a petition to adjudicate the defendant as a habitual offender based on the previously mentioned Class X convictions. *Id.* The trial court granted the petition and sentenced the defendant to natural life in prison. *Id.* ¶ 47. Like defendant in this case, the defendant argued on appeal, *inter alia*, that the trial court's consideration of his two prior Class X felony convictions to both establish an element of his AHC conviction and to sentence him to natural life in prison under the habitual offender statute constituted an improper double enhancement. *Id.* ¶ 74.

¶ 71 This court found consideration of the Class X convictions for both the AHC conviction and as the basis to adjudicate the defendant a habitual offender was, in fact, a double enhancement—but not an improper one. *Id.* ¶ 82. This court reasoned as follows:

"Although we find defendant was subject to a double enhancement, we conclude this case represents an instance where 'the legislature clearly intends to enhance the penalty based upon some aspect of the crime and that intention is clearly expressed.' [Citation.] Specifically, based on the language of the respective statutes, the legislature clearly expressed its intention that defendant's prior two Class X felony offenses be used as elements of the armed habitual criminal offense under section 24-1.7(a) of the Criminal Code (720 ILCS 5/24-1.7(a) (West 2014)) and to sentence defendant to natural life imprisonment as a habitual criminal under section 5-4.5-95(a) of the Unified Code (730 ILCS 5/5-4.5-95(a) (West 2014)). [Citations.]

Under section 24-1.7(a) of the Criminal Code (720 ILCS 5/24-1.7(a) (West 2014)), defendant is guilty of the Class X felony of armed habitual criminal based on his possession of a firearm after twice being convicted of enumerated offenses. Under section 5-4.5-95(a)(5) of the Unified Code (730 ILCS 5/5-4.5-95(a)(5) (West 2014)), defendant 'shall be sentenced to a term of natural life imprisonment' where this was his third Class X felony conviction. The statutory language reflects a legislative decision to mandate a natural life sentence for third-time repeat Class X offenders. This makes sense given the reasonable goals of protecting society and recognizing third-time repeat offenders' demonstrated unwillingness to comply with societal expectations, refrain from engaging in serious criminal activity, and seek rehabilitation. In light of this unequivocal legislative directive, the trial court properly employed a double enhancement when imposing its sentence in this matter. Thus, the trial court did not err." *Id.* ¶¶ 82-83.

¶ 72 The defendant filed a petition for leave to appeal to the supreme court. *People v. O'Neal*, No. 127171 (Ill. Nov. 30, 2022) (supervisory order). The supreme court denied the petition but, in an exercise of its supervisory authority, vacated this court's decision and remanded with directions to consider the effect of the supreme court's decision in *People v. Stewart*, 2022 IL 126116 (holding that the defendant's felony burglary conviction at age 17 was not a qualifying offense for purposes of habitual offender sentencing under section 5-4.5-95(b) of the Unified Code). On remand, this court reversed and remanded, concluding the trial court committed plain error by adjudicating the defendant a habitual offender and sentencing him to natural life in prison because he committed one of the two predicate Class X offenses when he was 17 years old. *People v. O'Neal*, 2023 IL App (4th) 170682-UB, ¶ 1. This court affirmed the judgment in all other respects not related to sentencing. *Id.* ¶¶ 10, 22.

¶ 73 The parties acknowledge that the grounds for reversal upon remand in *O'Neal* are not applicable in this case, as there is no dispute defendant committed the predicate offenses qualifying defendant for habitual offender sentencing when he was over the age of 21 years old. See *id.* ¶ 1; see also 730 ILCS 5/5-4.5-95(a)(4)(E) (West 2020) (stating habitual offender sentencing does not apply unless the first predicate offense was committed when the defendant was over the age of 21). However, on remand, this court did not reaffirm the portion of the analysis related to the issue of double enhancement. *O'Neal*, 2023 IL App (4th) 170682-UB, ¶ 10, 22. Defendant argues that portion of the initial *O'Neal* decision was incorrectly decided because there was no basis, other than the text of the statute, for concluding the legislature unequivocally intended to permit double enhancement. The State responds that portion of *O'Neal* was correctly decided and defendant's natural life sentence should be affirmed.

¶ 74 We agree with the State that defendant's natural life sentence under the habitual offender statute was a permissible double enhancement under the circumstances of this case for the same reasons outlined in the initial *O'Neal* decision. See *O'Neal*, 2021 IL App (4th) 170682, ¶¶ 82-83. Contrary to defendant's assertion, the statutory text *is* a proper basis from which to glean the legislature's intention to punish habitual offenders regardless of whether a Class X felony qualifying the defendant for such sentencing is also used to establish an element of the present offense. The statute states a defendant convicted of three separate Class X felonies "*shall* be sentenced to a term of natural life imprisonment." (Emphasis added.) 730 ILCS 5/5-4.5-95(a)(5) (West 2018). We agree with the reasoning in *O'Neal* that this language reflected a legislative decision to mandate a natural life sentence for third-time repeat Class X offenders who meet the statutory criteria. Defendant does not dispute he meets the statutory criteria. Accordingly, we conclude the trial court did not err when it adjudicated defendant a habitual offender and sentenced him to natural life in prison. Defendant is not entitled to a new sentencing hearing as a result.

¶ 75 III. CONCLUSION

¶ 76 For the reasons stated, we affirm the trial court's judgment.

¶ 77 Affirmed.

*People v. Taylor*, 2023 IL App (4th) 220381

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 18-CF-491; the Hon. Rudolph M. Braud Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Matthew S. Goldman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |